Case No. 1:19-cv-887-CFC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

_____

In re LMI Legacy Holdings, Inc., *et al.*,
Reorganized Debtors,

_____

Edward L. Lipscomb, Special Trustee of the LMI GUC Trust,
Plaintiff/Appellant,

v.

Clairvest Equity Partners Limited Partnership, Clairvest Group, Inc., Clairvest GP Manageco Inc., David Sturdee, Kenneth B. Rotman, Aly Champsi, Alan Torrie and Sidney M. Horn, *et al.*,

Defendants/Appellees.

_____

Appeal from the United States Bankruptcy Court
for the District of Delaware
Chapter 11 Bankruptcy Case No. 13-12098
Adversary Proceeding Case No. 15-51069

_____

## RESPONSE BRIEF OF CLAIRVEST APPELLEES
_____

| | |
|---|---|
| Stephen M. Miller (DE Bar No. 2610)<br>MORRIS JAMES LLP<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE  19899-2306<br>Telephone: (302) 888-6800<br>Facsimile: (302) 571-1750<br>E-mail:  smiller@morrisjames.com | David T.B. Audley (*pro hac vice*)<br>Michael T. Benz (*pro hac vice*)<br>CHAPMAN AND CUTLER LLP<br>111 West Monroe Street<br>Chicago, IL  60603-4080<br>Telephone: (312) 845-3000<br>Facsimile: (312) 701-2361<br>E-mail:  audley@chapman.com<br>E-mail:  benz@chapman.com |

11153589

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO BANKRUPTCY RULE 8012

Delaware District Court Case No. 1:19-cv-887-CFC
Chapter 11 Bankruptcy Case No. 13-12098
Adversary Proceeding Case No. 15-51069

This Corporate Disclosure Statement is made by the following Corporate

Party: Clairvest Group, Inc.

The above-named corporate party hereby identifies the following entity or

entities as its parent corporation(s) and/or the following publicly-held corporation as

owning 10% or more of the corporate party's stock:

Clairvest Group, Inc. is a public company.   There are no publicly-held

corporations that own 10% or more of the stock of Clairvest Group, Inc.


Dated:  September 6, 2019                    Respectfully submitted,

                                             CHAPMAN AND CUTLER LLP

                                             By: /s/    David T. B. Audley
                                             _____

                                             *Attorneys for Clairvest Appellees*


11153589

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO BANKRUPTCY RULE 8012

Delaware District Court Case No. 1:19-cv-887-CFC
Chapter 11 Bankruptcy Case No. 13-12098
Adversary Proceeding Case No. 15-51069

This Corporate Disclosure Statement is made by the following Corporate

Party: Clairvest GP Manageco Inc.

The above-named corporate party hereby identifies the following entity or

entities as its parent corporation(s) and/or the following publicly-held corporation as

owning 10% or more of the corporate party's stock:

The sole shareholder and parent company of Clairvest GP Manageco Inc. is

Clairvest Group, Inc.  Clairvest Group, Inc. is a public company.


Dated:  September 6, 2019                     Respectfully submitted,

                                              CHAPMAN AND CUTLER LLP

                                              By: /s/    David T. B. Audley
                                              _____
                                                  *Attorneys for Clairvest Appellees*

11153589

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... III

I.   STATEMENT OF ISSUES PRESENTED AND APPLICABLE STANDARD
     OF REVIEW .................................................................................... 1

II.  STATEMENT OF THE CASE ................................................................ 2

     A.   The Debtors and the Parties to this Appeal ............................ 3

     B.   The Allegations of Plaintiff/Appellant's Complaint ............................ 5

     C.   Procedural History ................................................................ 11

          1.   Clairvest Appellees' Motion to Dismiss ................................... 11

          2.   The Bankruptcy Court's Opinion ............................................. 11

          3.   Plaintiff/Appellant's Motion for Reconsideration ................... 13

          4.   Dismissal of Remaining Claims ............................................... 13

III. SUMMARY OF ARGUMENT ............................................................. 14

IV.  ARGUMENT ................................................................................... 17

     A.   Legal Standards Applicable to Motions to Dismiss ............................ 17

     B.   The Bankruptcy Court Correctly Dismissed Counts I and II
          of the Complaint Because of the Exculpatory Clause ........................ 19

          1.   The Complaint Fails to Plead a Plausible Claim that
               Clairvest Controlled the LMI Board of Directors .................... 23

          2.   The Exculpatory Clause Bars the Claims Asserted
               from the First Sale Process ..................................................... 26

          3.   The Exculpatory Clause Bars the Claims Asserted
               from the Second Sale Attempt ................................................. 32

          4.   The Exculpatory Clause Bars the Claims Asserted
               from the Failed LMR Merger .................................................. 37

5.      The Bankruptcy Court Properly Concluded that the
        Complaint Failed to Plead that the Clairvest
        Appellees Caused Damage to LMI ............................................40

C.      The Bankruptcy Court Did Not Abuse Its Discretion in
        Dismissing the Complaint with Prejudice ............................................42

V.      CONCLUSION .......................................................................................43

## TABLE OF AUTHORITIES

PAGE

### CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................17

*Auerbach v. Bennett*, 47 N.Y.2d 619 (N.Y. 1979)...................................19

*Barr v. Wackman*, 36 N.Y.2d 371, 329 N.E.2d 180 (1975) ....................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007)............................. 17, 25

*Berger v. Fogarty*, 51 Misc. 2d 628, 273 N.Y.S.2d 620 (N.Y. Supr.,
N.Y. Co., 1965)..................................................................................23

*Blaustein v. Pan Am. Petroleum & Transp. Co.*, 263 A.D. 97, 119, 31
N.Y.S.2d 934 (1st Dep't 1941), *aff'd*, 293 N.Y. 281, 56 N.E.2d
705 (1944)..........................................................................................23

*Edelson v. Soricelli*, 610 F.2d 131 (3d Cir. 1979) ...................................18

*Foley v. D'Agostino*, 21 A.D.2d 60, 248 N.Y.S.2d 121 (1964) ..............20

*Foman v. Davis*, 371 U.S. 178 (1962) .....................................................41

*Friedman v. Wahrsager,* 848 F.Supp.2d 278 (E.D.N.Y. 2012)...............19

*Higgins v. N.Y. Stock Exchange, Inc.*, 806 N.Y.S.2d 339 (N.Y. Sup. Ct.
2005) ..................................................................................................19

*In re Ampal-Am. Israel Corp.*, 543 B.R. 464 (Bankr. S.D.N.Y. 2016) .......... passim

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)...............41

*In re Hecla Min. Co. Derivative S'holder Litig.*,
No. 2:12-CV-000119-MHW, 2014 WL 689036 (D. Idaho
Feb. 20, 2014)....................................................................................37

*In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606 (Bankr. D. Del.
2017) ......................................................................................... passim

11153589

*In re LMI Legacy Holdings, Inc.*, 2017 WL 3432366 (Bankr. D. Del. 2017) ................................................................................................13

*In re Midway Games Inc.*, 428 B.R. 303 (Bankr. D. Del. 2010) .............................31

*In re Mundo Latino Market Inc.*, 590 B.R. 610 (Bankr. S.D.N.Y. 2018) ...............25

*In re NYMEX S'holder Litig.*, 2009 WL 3206051 (Del. Ch. Ct. Sept. 30, 2009) ........................................................................................... 19, 20

*In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746 (Bankr. S.D.N.Y. 2012) ................................................................................................39

*In re Sea-Land Corp. Shareholders Litig.*, No. CIV. A. 8453, 1987 WL 11283 (Del. Ch. May 22, 1987) ...................................................23

*In re Trados Inc. Shareholder Litigation*, 2009 WL 2225958 (Del. Ch. 2009) ................................................................................................35

*Marx v. Akers*, 88 N.Y.2d 189, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (1966) ................................................................................................20

*Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir. 1984) ..........................19

*Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192 (3d Cir. 1993) ...........................................................................17

*Rattner v. Bidzos*, No. CIV.A. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ...........................................................................38

*Ritani, LLC v. Aghjayan*, 880 F.Supp.2d 425 (S.D.N.Y. 2012) .............................20

*Rosen v. Unilever U.S., Inc.*, 2010 WL 4807100 (N.D. Cal. 2010) .......................18

*Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 210 F.Supp.3d 1259 (D. Or. 2016) ...............................................................................18

*RSL Comm'ns PLC v. Bildirici*, 649 F.Supp.2d 184 (S.D.N.Y. 2009) ...................20

*SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329 (2d Cir. 2004) ........................19

*Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000) .....................................................41

11153589

*Stein v. Immelt*, 472 Fed.Appx. 64 (2d Cir. 2012)....................................................20

*Stern v. Gen. Elec. Co.*, 837 F. Supp. 72 (S.D.N.Y. 1993) *aff'd,* 23 F.3d
    746 (2d Cir. 1994)........................................................................................36

*Teachers' Ret. Sys. of Louisiana v. Welch*, 244 A.D.2d 231 , 664
    N.Y.S.2d 38 (1st Dep't 1997)......................................................................39

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F.Supp.2d
    376 (S.D.N.Y. 2013)...................................................................................23

*U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383 (3d Cir. 2002) ........................17

*Williamson v. Cox Commc'ns, Inc.*, No. CIV.A. 1663-N, 2006 WL
    158375 (Del. Ch. Ct. June 5, 2006).............................................................23

*Wood v. Baum*, 953 A.2d 136 (Del. 2008).............................................................37

## STATUTES

28 U.S.C. § 158.......................................................................................................1

N.Y. BUS. CORP. LAW § 402(b).............................................................................21

## RULES

Fed.R.Bankr.P. 7012 ...............................................................................................10

Fed.R.Bankr.P. 9023 ...............................................................................................13

Fed.R.Civ.P. 12(b)(6)..............................................................................................10

Fed.R.Civ.P. 59(e)...................................................................................................13

Defendants/Appellees Clairvest Equity Partners Limited Partnership ("*CLP*"), Clairvest Group Inc. ("*CGI*"), Clairvest GP Manageco Inc. ("*CGM*," and collectively with CLP and CGI, "*Clairvest*" or the "*Clairvest Entities*"), David Sturdee, Kenneth B. Rotman, Aly Champsi, Alan Torrie and Sidney M. Horn (collectively, the "*Clairvest Directors,*" and together with the Clairvest Entities, the "*Clairvest Appellees*"), herewith submit their response brief in this appeal.[1]

## I.   STATEMENT OF ISSUES PRESENTED AND APPLICABLE STANDARD OF REVIEW

A.   Whether the Bankruptcy Court erred in entering the Clairvest Dismissal Order (as defined below), dismissing Counts I and II of the Complaint for their failure to allege a plausible claim for breach of fiduciary duty, where the certificate of incorporation included a broad exculpatory clause. The Clairvest Appellees agree that the applicable standard of review is *de novo*.

B.   Whether the Bankruptcy Court abused its discretion in denying Plaintiff/Appellant leave to amend Counts I and II of the Complaint, where further amendment would have been futile because of the exculpatory clause. The Clairvest Appellees agree that the applicable standard of review is abuse of discretion.

---

[1]   The Bankruptcy Court's decision to dismiss Counts I and II of the Complaint is presented for review to this Court in an appellate capacity pursuant to 28 U.S.C. § 158.

11153589

## II.   STATEMENT OF THE CASE

Plaintiff/Appellant appeals from an order entered by Bankruptcy Judge Christopher Sontchi on April 27, 2017, dismissing Counts I and II of the Complaint against the Clairvest Appellees, and denying leave to amend (the "*Clairvest Dismissal Order*"). (Clairvest Appx. Ex. 1).[2] The sole issues in this Appeal are whether the Bankruptcy Court erred in dismissing Counts I and II of the Complaint, and whether the Bankruptcy Court abused its discretion in denying Plaintiff/Appellant leave to amend the Complaint.

The Clairvest Appellees respectfully submit that Bankruptcy Judge Sontchi correctly dismissed the Complaint because Plaintiff/Appellant failed to state a plausible claim that the Clairvest Appellees breached a fiduciary duty. The Clairvest Appellees further submit that Bankruptcy Judge Sontchi properly exercised his discretion in denying leave to amend where amendment would have been futile in light of the broad exculpatory clause on which Judge Sontchi based the Clairvest Dismissal Order.

---

[2]  Contemporaneous with the filing of this response brief, the Clairvest Appellees have filed their Appendix pursuant to Bankruptcy Rule 8018(b)(2). Citations to the Clairvest Appellees' Appendix herein will be in the following form: "(Clairvest Appx. Ex. __, p. __ or ¶__)." The page number, when cited, refers to the page number of the Appendix document cited. Citations to documents on the docket of the LMI bankruptcy case will be in the following form: "[D.I. __, p. __ or ¶__]." The page number, when cited, refers to the page number of the docket item as assigned by the ECF system on the top of each page. Citations to Plaintiff/Appellant's opening brief (the "*Opening Brief*") will be in the following form: "(Opening Brief, p. __)".

11153589

A.      **The Debtors and the Parties to this Appeal**[3]

This appeal concerns the bankruptcy of LMI Legacy Holdings, Inc. and its affiliated companies ("*LMI*"). LMI's business was the sale and rental of respiratory and enteral medical equipment and mobility products. (Clairvest Appx. Ex. 3, ¶36). The majority of LMI's sales and rentals were historically paid for through third-party payor groups, such as Medicare. (Clairvest Appx. Ex. 3, ¶37). In 2003, the U.S. Congress enacted legislation requiring a competitive bidding process for many of the items sold and rented by LMI ("*Competitive Bidding*"). (Clairvest Appx. Ex. 3, ¶38). As a supplier, LMI was compelled to take part in the process to secure Medicare contracts. (Clairvest Appx. Ex. 3, ¶38).

On August 16, 2013 (the "*Petition Date*"), LMI, along with several affiliated companies (the "*Debtors*"), filed voluntary petitions for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (administratively consolidated Case No. 13-12098) (Clairvest Appx. Ex. 3, ¶32). On March 13, 2014, the Debtors filed their Joint Plan of Liquidation of LMI Legacy Holding Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [D.I. 650] (as amended and modified, the "*Plan*"). On April 28, 2014, the court entered an order confirming the

---

[3]   In support of the Clairvest Dismissal Order, Judge Sontchi issued his Opinion, also dated April 27, 2017. *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606 (Bankr. D. Del. 2017). (Clairvest Appx. Ex. 2, the "*Opinion*").

- 3 -

Plan. [D.I. 761] (the "*Confirmation Order*"). On May 1, 2014, the Plan became effective. (Clairvest Appx. Ex. 3, ¶14).

Under the Plan and Confirmation Order, as well as a settlement agreement approved by the Bankruptcy Court [*see* D.I. 282], the right to prosecute the claims asserted in the Complaint were transferred to the "GUC Trust" – a trust established for the benefit of the holders of allowed general unsecured claims asserted against the Debtors. Plaintiff/Appellant is the Special Trustee of the GUC Trust. (Clairvest Appx. Ex. 3, ¶¶15-17).

The Clairvest Entities are Canadian companies. CLP and Clairvest Acquisition LLC, the majority shareholders of LMI, held 62.5% of the common stock of LMI as of the Petition Date. (Clairvest Appx. Ex. 3, ¶18). Defendants/Appellees Sturdee, Rotman and Champsi were members of the nine-person LMI Board of Directors and were also employed at Clairvest.[4] (Clairvest Appx. Ex. 3, ¶¶19-21). Defendants/Appellees Torrie and Horn were also members of the LMI Board, having been nominated by Clairvest. (Clairvest Appx. Ex. 3, ¶¶27-28).

---

[4] In November 2012, Sturdee resigned and was replaced on the LMI board by Rotman. (Clairvest Appx. Ex. 3, ¶¶19-20). They did not serve on the Board at the same time.

11153589

**B.      The Allegations of Plaintiff/Appellant's Complaint**[5]

Plaintiff/Appellant filed his Complaint on April 16, 2016 (the "*Complaint*"). (Clairvest Appx. Ex. 3). The Complaint alleges that in November 2011 Clairvest, due to a "perceived uncertainty in the industry due to looming changes related to Competitive Bidding," exercised its rights under LMI's shareholders agreement (the "*Shareholders Agreement*") to sell LMI. (Clairvest Appx. Ex. 3, ¶68). At a November 4, 2011 LMI Board meeting, the Board created a three-person subcommittee of Sturdee (nominated by Clairvest), Alan Landauer, LMI's chairman and founder, and Louis P. Rocco, LMI's President, "to oversee the sale process." (Clairvest Appx. Ex. 3, ¶71). RBC Capital Markets, LLC ("*RBC*"), an arm of Royal Bank of Canada, was engaged as investment banker. (Clairvest Appx. Ex. 3, ¶3). The Complaint alleges that this entire process was a sham and that the LMI Board left the sale process entirely to the Clairvest Appellees. (Clairvest Appx. Ex. 3, ¶¶2-4).

Once the sale process yielded no buyers, the Complaint alleges that the Board ignored the potential negative financial impact to LMI of the new Competitive Bidding requirements by not pursuing strategic partnerships with other companies that also had Medicare licenses, thus hedging against the loss of business resulting from Competitive Bidding. The Complaint alleges this strategy, "would have been

---

[5]  Plaintiff/Appellant's statement of the facts in his Opening Brief borrows extensively from the Complaint and extends to sixteen pages. (Opening Brief, pp. 4-20). The Opinion includes a thorough description of the factual background of this case which this Court may find useful.

11153589

a strategy to prevent these Chapter 11 cases." (Clairvest Appx. Ex. 3, ¶84). Quoting from a Clairvest internal memorandum of February 2012, the Complaint alleges that LMI's Board, at Clairvest's direction, ignored this option because the Clairvest Appellees were interested only in liquidating Clairvest's investment in LMI. (Clairvest Appx. Ex. 3, ¶83).

On or about January 30, 2013, LMI learned that it had been disqualified from round two of Competitive Bidding and had not "won any bids." (Clairvest Appx. Ex. 3, ¶92). As a consequence, as of July 1, 2013, LMI would not have any contracts to supply products to new Medicare patients. (Clairvest Appx. Ex. 3, ¶92). As set forth in the minutes of the March 4, 2013 Board meeting (referenced in the Complaint at paragraph 96), the disclosure by management to the LMI Board about the results of round two of Competitive Bidding was unexpected, and "was met with shock at the incredibly low Single Payment amounts resulting from the bidding process." [D.I. 100-2, p. 2].

The Complaint alleges that Clairvest, on its own, commenced new efforts to negotiate a sale of LMI. The Complaint alleges that by April 2013, Defendant Champsi had "discussed a possible sale or merger" of LMI with at least six companies: Allcare, Bioscript, Lincare, Quadrant, Medstar Surgical and Community. (Clairvest Appx. Ex. 3, ¶100). On April 29, 2013, a nonbinding Letter of Intent with Allcare was executed, providing that Allcare would acquire LMI by

- 6 -

paying LMI's existing shareholders $33 million in cash and assuming LMI's debt. (Clairvest Appx. Ex. 3, ¶106).

The Complaint alleges that the Clairvest Appellees nonetheless continued discussing potential transactions with other suitors (Clairvest Appx. Ex. 3, ¶109), and, with other offers in hand, "acted quickly" to finalize a deal with Allcare. (Clairvest Appx. Ex. 3, ¶117). At the May 13, 2013 LMI Board meeting, and with the July 1, 2013 cutoff of Medicare contracts fast approaching, Champsi provided the LMI Board with an update of the potential transactions and the process to date. (Clairvest Appx. Ex. 3, ¶121). As the minutes of the Board meeting reflect, an extended back and forth regarding the potential transactions occurred. (Clairvest Appx. Ex. 3, ¶121) [D.I. 100-3, pp. 2-4]. The Board discussed its fiduciary duties, noting that several constituencies needed to be considered, including those of the creditors. [D.I. 100-3, p. 3]. Discussion thereafter was held on the issue of whether the Board should pursue the Allcare transaction or whether the Board should maintain the status quo and not approve any proposed transaction. [D.I. 100-3, p. 3]. At the discussion's end, the Board, by an 8-1 vote, submitted the Allcare transaction to the shareholders for approval and authorized management to take all actions necessary to consummate the transaction. [D.I. 100-3, p. 3]. Thereafter, on May 15, 2013, LMI entered into a standstill agreement with Allcare. (Clairvest Appx. Ex. 3, ¶122).

11153589

On May 20, 2013, LMI received notice that the U.S. Attorney General's office had initiated a civil investigation demand regarding alleged violations of the Federal False Claims Act by LMI. (Clairvest Appx. Ex. 3, ¶124). As a consequence, Allcare insisted that a large portion of the proposed consideration to LMI's shareholders be used to indemnify the surviving company in case of liability. (Clairvest Appx. Ex. 3, ¶125). Champsi requested that Allcare waive its rights under the standstill agreement to permit LMI to meet with Medstar Surgical and Ocean Medical over a potential alternative deal. (Clairvest Appx. Ex. 3, ¶126). Negotiations then ensued with Medstar and Ocean over a three-way merger arrangement. (Clairvest Appx. Ex. 3, ¶127). At that time, Rite Care also expressed an interest in joining the proposed merger. (Clairvest Appx. Ex. 3, ¶128). The LMI Board then held a two-day meeting on June 3-4, 2013 to discuss the new proposals, including the revised Allcare proposal. (Clairvest Appx. Ex. 3, ¶129); [D.I. 100-4, pp. 2-3; D.I. 100-5, pp. 2-3]. At the conclusion of this two-day meeting, the LMI Board *unanimously* agreed to proceed with the Medstar and Ocean transactions, including LMI entering into a triangular merger with a new holding company pursuant to which LMI's shareholders would receive a combination of common stock and debt of the new holding company. [D.I. 100-5, p. 2]. Thereafter, Ocean backed out of the merger and Rite Care replaced Ocean under a new merger arrangement (the "*LMR Merger*"). (Clairvest Appx. Ex. 3, ¶134). On June 17, 2013, the LMR Merger was approved at a special meeting of shareholders. (Clairvest Appx. Ex. 3, ¶134). Under the merged

- 8 -

company, Rocco was to be designated as the co-CEO with Zeb Pirzada ("*Pirzada*"), the CEO of Medstar Surgical, an arrangement with which Rocco had expressed dissatisfaction, but which he nonetheless voted in favor of. (Clairvest Appx. Ex. 3, ¶¶136-38).

The Complaint alleges that immediately thereafter, LMI began having difficulty implementing the merger due to certain non-compliance issues. Notwithstanding these issues, the Complaint alleges that Champsi and Pirzada alerted Rocco that they intended to operate the merged companies "in violation of the law" until management could resolve the non-compliance issues. (Clairvest Appx. Ex. 3, ¶135). To remedy the issue of non-compliance, Clairvest proposed certain work-around solutions, including a subcontracting arrangement under which LMI could comply with Medicare regulations and use Rite Care's Medicare contracts. (Clairvest Appx. Ex. 3, ¶148). At the same time, without the merger finalized, LMI is alleged to have transferred a total of $300,000 to Medstar on June 20, 2013, June 27, 2013 and July 3, 2013. (Clairvest Appx. Ex. 3, ¶146). By early July 2013, the merger had yet to be finalized and LMI's banks had not yet approved it. (Clairvest Appx. Ex. 3, ¶¶145-46). As a result, LMI could not take any Medicare orders, instead having to forward them to Rite Care. (Clairvest Appx. Ex. 3, ¶145).

On July 10, 2013, LMI reached a compromise with its lender, TD Bank, under which the bank agreed to consent to the merger. (Clairvest Appx. Ex. 3, ¶149). This compromise with TD Bank, according to the Complaint "would have led to the

- 9 -

consent from TD Bank required to consummate the LMR Merger, *potentially ultimately saving [LMI]*." (Clairvest Appx. Ex. 3, ¶149) (emphasis added). Within hours thereafter, however, Rocco and Burdi resigned from their positions and joined Allcare (Clairvest Appx. Ex. 3, ¶¶150, 154), persuading key employees at LMI to join them.   (Clairvest Appx. Ex. 3, ¶151). As a result of Rocco's and Burdi's resignations, TD Bank withheld its consent to the LMR Merger and declared a material adverse change under its credit agreement with LMI. (Clairvest Appx. Ex. 3, ¶159). As a result, LMI was unable to meet its payroll obligations without prior approval from TD Bank, leading to LMI's bankruptcy filing. (Clairvest Appx. Ex. 3, ¶159). In the words of Alan Landauer, LMI's chairman and a non-defendant, the "failed Allcare transaction and the events that followed – including Allcare's improper solicitation and hiring away of Debtors' senior employees – irreparably harmed the Debtors' business and were *a primary cause of the Debtors' need to seek bankruptcy protection*." [D.I. 100-6, ¶44, p. 16] (emphasis added).

In Counts I and II of the Complaint, Plaintiff/Appellant seeks to hold the Clairvest Appellees liable for LMI's bankruptcy filing and the associated economic losses by alleging that they breached their fiduciary duties to LMI and its shareholders. Count I is against all directors, including the Clairvest Directors. Count II is against the Clairvest Directors and the Clairvest Entities.

## C.   Procedural History

### 1.   Clairvest Appellees' Motion to Dismiss

The Clairvest Appellees challenged the allegations in the Complaint by filing a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Bankruptcy Rule 7012) (the "*Clairvest Dismissal Motion*"). [D.I. 98]. The Clairvest Dismissal Motion sought dismissal of all counts in the Complaint against the Clairvest Appellees – to wit, Counts I, II, X, XI, XII, XV, XVI, XVII and XVIII. Motions to dismiss were filed as well by the other defendants [D.I. 96, 101, 108] (together with the Clairvest Dismissal Motion, the "*Dismissal Motions*").

On February 23, 2017, Judge Sontchi entertained nearly five hours of oral argument on the Dismissal Motions. (Clairvest Appx. Ex. 4). On April 27, 2017, Judge Sontchi entered the Clairvest Dismissal Order (Clairvest Appx. Ex. 1), dismissing with prejudice the fiduciary duty claims against the Clairvest Appellees, and issued the Opinion (Clairvest Appx. Ex. 2).

### 2.   The Bankruptcy Court's Opinion

In the Opinion, the Bankruptcy Court addressed the allegations in Counts I and II of the Complaint against the backdrop of the exculpatory clause in LMI's certificate of incorporation (the "*Exculpatory Clause*"), which provided:

> No director shall be personally liable to the corporation or its shareholders for damages for any breach of duty in such capacity, except that this provision shall not eliminate or limit the liability of any director (i) if a judgement or other final adjunction adverse to such director establishes that such director's acts or omissions with in bad faith or involved intentional misconduct or a knowing violation of

- 11 -

law or that such director personally gained in fact a
financial profit or other advantage to which such director
was not legally entitled or that such director's acts violated
Section 719 of the Business Corporation law of (ii) for any
act or omission prior to the adoption of this provision.[6]

Judge Sontchi applied New York law[7] (*In re LMI Legacy Holdings, Inc.*, 2017
WL 1508606, *4-5 (Bankr. D. Del. 2017)) which dictates that fiduciary duty claims
premised on the breach of the "duty of care" are unavailable when certificate of
incorporation language like the Exculpatory Clause has been adopted by the
corporation for the protection of its directors. *Id.* at *6-7. Judge Sontchi held that the
allegations against the Clairvest Appellees in Counts I and II, essentially charging
the Clairvest Appellees with negligent acts and omissions, were "duty of care claims,
and not duty of loyalty claims" (*Id.* at *9), and were accordingly barred by the
Exculpatory Clause. Indeed, at oral argument Judge Sontchi noted: "This, I mean, it
does seem to me like duty of care violations, not duty of loyalty violations. He did a
crappy job…. Well that's – I mean if that's the thrust of your complaint then there
is no action here because they have exculpation for being bad directors." (Clairvest
Appx. Ex. 4, p. 107).

After reviewing the allegations of the Complaint in detail, Judge Sontchi
further held that Plaintiff/Appellant failed to plead around the Exculpatory Clause

---

6   The Exculpatory Clause can be found in LMI's certificate of incorporation at D.I.
    100-13, p. 4, D.I. 100-15, pp. 4, 30.

7   In his Opening Brief, the Plaintiff/Appellant acknowledges and agrees that New
    York law applies to this appeal. (Opening Brief, p. 28). This concedes an issue
    that was contested in the proceedings below before Judge Sontchi.

- 12 -

by alleging a plausible claim that the Clairvest Appellees acted in bad faith, engaged in intentional misconduct or received a personal benefit. *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, *8 (Bankr. D. Del. 2017). Judge Sontchi determined that the Clairvest Appellees were accordingly entitled to the benefit of the "business judgment rule." *Id.* at *9. Judge Sontchi therefore dismissed Counts I and II of the Complaint against the Clairvest Appellees with prejudice. (Clairvest Appx. Ex. 1).

### 3.   Plaintiff/Appellant's Motion for Reconsideration

On May 11, 2017, Plaintiff/Appellant moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) (made applicable by Bankruptcy Rule 9023). [D.I. 190]. On August 10, 2017, after the reconsideration motion was fully briefed, the Bankruptcy Court entered a Memorandum Order denying the motion (the "*Reconsideration Opinion*"). *In re LMI Legacy Holdings, Inc.*, 2017 WL 3432366 (Bankr. D. Del. 2017). (Clairvest Appx. Ex. 5). Judge Sontchi made clear in the Reconsideration Opinion that in light of the Exculpatory Clause, amendment of Counts I and II of the Complaint would be futile. *Id.* at *3 (Bankr. D. Del. 2017). This appeal followed.

### 4.   Dismissal of Remaining Claims

As noted in Plaintiff/Appellant's Opening Brief (Opening Brief, pp. 22-23), the Counts of the Complaint not dismissed in the Clairvest Dismissal Order were dismissed by the Bankruptcy Court upon agreement of the parties. In addition, Plaintiff/Appellant states in his Opening Brief that he does not appeal the dismissal

11153589

of Count XII against the Clairvest Appellees.[8] (Opening Brief, p. 23). Accordingly, this appeal of the Clairvest Dismissal Order relates only to the dismissal of Counts I and II.

## III.   SUMMARY OF ARGUMENT

Plaintiff/Appellant's argument in this case expresses the hindsight wish of every corporate bankruptcy debtor: that the company could have been sold for its going concern value before its fatal financial problems developed. Plaintiff/Appellant not only longs for what might have been; he blames the Clairvest Appellees for what happened instead.

Judge Sontchi dismissed Counts I and II of the Complaint for a very simple reason. He found that Plaintiff/Appellant's allegations implicated only the Clairvest Appellee's fiduciary "duty of care." The Exculpation Clause, permitted by and mirroring New York law, shielded the Clairvest Appellees from "duty of care" liability. Because the Exculpation Clause would continue to apply to any amended complaint, and because Plaintiff/Appellant failed to identify any new facts or allegations that would cause the Bankruptcy Court to reach a different result if the Complaint were amended, Judge Sontchi determined that leave to amend would be futile.

---

[8]   This concedes an issue that was contested in the proceedings below before Judge Sontchi.

11153589

In the Opinion, Judge Sontchi recognized that the Exculpation Clause would not bar claims against the Clairvest Appellees if the Complaint included plausible factual allegations that the Clairvest Appellees had acted in bad faith or gained a specific financial profit to which they were not legally entitled. However, Judge Sontchi concluded that there were no such factual allegations in the Complaint, only conclusions of bad faith, misconduct and financial gain, unsupported by any facts.

Clairvest, under the Shareholders Agreement, had the express right to require LMI to initiate a sale process, and the right to select RBC as investment banker as well. There are no factual allegations raising a plausible claim that the Clairvest Appellees did anything other than exercise such rights. As to the allegations that the Clairvest Appellees controlled the sale process, the Complaint itself, and the documents referenced therein, tell another story — that the LMI Board of Directors was very involved in the process. When the sale process was unsuccessful and LMI's business became threatened from the loss of its Medicare contracts, the Complaint alleges that the LMI Board, including the Clairvest Directors, did exactly what the Complaint alleges a responsible board should have done: seek merger partners for LMI with multiple third parties to ensure that LMI would remain viable after losing its Medicare contracts.

As the Complaint concedes, those efforts were initially successful, first resulting in a letter of intent with Allcare, and then leading the LMI Board in June 2013 to approve a three-party merger with MedStar Surgical and Rite Care, two

- 15 -

other medical equipment suppliers. The LMR Merger, approved by the LMI Board, convinced TD Bank, LMI's secured lender, to consent to the merger, "potentially ultimately saving the Company" according to the Complaint. (Clairvest Appx. Ex. 3, ¶149). The unexpected, subsequent resignation of Defendants/Appellees Rocco and Burdi, LMI's two most senior managers, and the exodus of employees with them to a competitor, however, caused TD Bank to withdraw its consent to the merger and declare a material adverse change under LMI's credit agreement. LMI's bankruptcy proceedings resulted.

At its core, the Complaint is the worst type of second-guessing of a board's business judgment. No factual allegations support the proposition that the Clairvest Appellees did anything other than fulfill their duties to LMI in a responsible manner. No factual allegations establish that Clairvest usurped the sale/merger process and excluded the LMI Board from involvement. Indeed, the LMI Board meeting minutes referenced in the Complaint establish that LMI's Board fulfilled its fiduciary obligations. The Board approved the sale process (including RBC), the Allcare transaction and the LMR Merger. The Complaint identifies no other offer that was lost because of the actions or inactions of the Clairvest Appellees. No factual allegations support the proposition that the Clairvest Appellees are responsible for the last-minute exodus of LMI's senior management, the act that the Complaint alleges caused TD Bank to pull the plug on LMI.

11153589

Plaintiff/Appellant asks this Court to overturn Judge Sontchi's decision based on the argument that the Complaint does indeed assert factual allegations against the Clairvest Appellees, sufficient to circumvent the Exculpatory Clause. This is the very same argument presented to and rejected by Judge Sontchi. It should also be rejected by this Court. The Clairvest Appellees respectfully request that this Court affirm the Clairvest Dismissal Order.

## IV.   ARGUMENT

### A.   Legal Standards Applicable to Motions to Dismiss

A complaint can survive a motion to dismiss "only if, taking all well-pleaded factual allegations as true, it contains enough facts to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). This plausibility standard requires more than a mere <u>possibility</u> that a defendant is liable to the plaintiff. *Iqbal*, 556 U.S. at 678 . . . When a complaint pleads facts that are merely "consistent with a defendant's liability," it "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557. The facts alleged must nudge the plaintiff's claims "across the line from conceivable to plausible." *Id.* at 570. While on a motion to dismiss, all well-pleaded facts are accepted as true, the trial court need not accept as true conclusory statements, statements of law or unwarranted inferences cast as factual allegations. *Twombly*, 550 U.S. at 555-57.

- 17 -

11153589

This Court may consider not only the allegations in the Complaint but also any "document *integral or explicitly relied* upon in the complaint." *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (emphasis in original). It may also consider matters "of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). New York federal courts routinely take judicial notice of exculpation provisions in certificates of incorporation on motions to dismiss. *In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 472-473 (Bankr. S.D.N.Y. 2016).[9]

As this Court evaluates Plaintiff/Appellant's arguments, and tests them against the pleading requirements established by the Supreme Court, it will see that Plaintiff/Appellee over and over again commits the *petitio principii* fallacy – otherwise known as "begging the question" or "circular reasoning." This occurs when one assumes that the conclusion has already been established. *Rosen v. Unilever U.S., Inc.*, 2010 WL 4807100, *5 (N.D. Cal. 2010). The "proof" in a circular argument is not proof at all. Instead, the conclusion is derived from a premise that <u>assumes</u> the conclusion. *Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 210 F.Supp.3d 1259, 1269-1270 (D. Or. 2016). One way to recognize this fallacy is to focus on the factual premise for the asserted conclusion. Has

---

9   Plaintiff/Appellant has dropped his argument on appeal that the Exculpatory Clause should not have been considered by Judge Sontchi in the context of the Dismissal Motions. This concedes an issue that was contested in the proceedings below before Judge Sontchi.

independent evidence sufficient to establish the conclusion been alleged? Or, has there merely been a reassertion or restatement of the conclusion using different words? *Id.* A litigant who employs this fallacy fails to establish the conclusion, using the argued conclusion as proof of itself. *Edelson v. Soricelli*, 610 F.2d 131, 133 (3d Cir. 1979). At the motion to dismiss stage, a plaintiff who asserts conclusions in a complaint, as though they were facts, does not satisfy the plausibility standard. *Rosen v. Unilever U.S., Inc.*, 2010 WL 4807100, *6 (D. N.D. Cal. 2010) (holding that the circular reasoning in plaintiff's complaint rendered it implausible on its face). Here, Plaintiff/Appellant offers conclusions that the Clairvest Appellees acted in bad forth and sought a preferred financial advantage, without any factual basis. He argues that <u>assumed</u> conclusions are enough when they clearly are not.

### B.   The Bankruptcy Court Correctly Dismissed Counts I and II of the Complaint Because of the Exculpatory Clause

To assert a breach of fiduciary duty under New York law, a plaintiff must show (1) a breach by a fiduciary of a duty owed to the plaintiff, (2) defendant's knowing participation, and (3) damages. *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004). There are two components to a director's fiduciary duties to a corporation: a duty of care, and a duty of loyalty and good faith. *See Friedman v. Wahrsager,* 848 F.Supp.2d 278, 288 (E.D.N.Y. 2012); *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984). Absent a breach of duty, the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and

legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 47 N.Y.2d 619, 620 (N.Y. 1979).

The fiduciary duty of care obligates directors to act on a reasonably informed basis. *Higgins v. N.Y. Stock Exchange, Inc.*, 806 N.Y.S.2d 339, 362 (N.Y. Sup. Ct. 2005). In satisfying the duty of care, the law imposes no blueprint on how corporate directors fulfill their duties. *See In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *7 (Del. Ch. Ct. Sept. 30, 2009); *RSL Comm'ns PLC v. Bildirici*, 649 F.Supp.2d 184, 211-12 (S.D.N.Y. 2009). Nor does it require a board to hold "frequent" meetings, *RSL Comm'ns PLC*, 649 F.Supp.2d at 212, or prevent a board from delegating responsibility of negotiation or oversight to individual board members or a committee thereof. *In re NYMEX*, 2009 WL 3206051, at *7.

The fiduciary duty of loyalty dictates that an officer or director "may not assume and engage in the promotion of personal interests which are incompatible with the superior interests of their corporation." *Foley v. D'Agostino*, 21 A.D.2d 60, 248 N.Y.S.2d 121, 128 (1964); *accord Ritani, LLC v. Aghjayan*, 880 F.Supp.2d 425, 454 (S.D.N.Y. 2012). "Director interest may either be self-interest in the transaction at issue (*see, Barr v. Wackman*, 36 N.Y.2d 371, 329 N.E.2d 180, 184 (1975) [receipt of 'personal benefits']), or a loss of independence because a director with no direct interest in a transaction is 'controlled' by a self-interested director." *Marx v. Akers*, 88 N.Y.2d 189, 644 N.Y.S.2d 121, 666 N.E.2d 1034, 1041 (1966). "The test for self-interestedness is not whether a director or someone who controls him has engaged

in or is liable for some sort of misconduct, but whether he will 'receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally.'" *Stein v. Immelt*, 472 Fed.Appx. 64, 66 (2d Cir. 2012) (quoting *Marx,* 644 N.Y.S.2d 121, 666 N.E.2d at 1042).

The Bankruptcy Court, commenting on the distinction between the duties of care and loyalty, stated:

> Courts have, at times, found the distinction between an exculpable lack of due care and a non-exculpable lack of loyalty and good faith difficult to discern. In turning to Delaware law, New York courts have found lack of due care involves fiduciary action taken solely by reason of gross negligence and without any malevolent intent. *Gross negligence includes a failure to inform one's self of available material facts, and without more, cannot constitute bad faith. Instead, bad faith involves either subjective bad faith where the fiduciary is motivated by an actual intent to do harm, or a conscious disregard of one's fiduciary duties involving misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision.*

*In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, *8 (Bankr. D. Del. 2017) (emphasis added).

As the Bankruptcy Court correctly concluded, the claims for breach of the duty of care in this case are barred by the Exculpatory Clause. Section 402(b) of the New York Business Corporation Law (the "*New York BCL*") provides that, with certain exceptions, a "certificate of incorporation may set forth a provision eliminating or limiting the personal liability of directors to the corporation or its

shareholders for damages for any breach of duty in such capacity …" N.Y. Bus. Corp. Law § 402(b) Generally, section 402(b) shields a corporation's directors from liability for negligent acts or omissions occurring in their capacity as directors. *In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 473 (Bankr. S.D.N.Y. 2016). It also identifies five types of conduct that cannot be exculpated: (1) bad faith, (2) intentional misconduct, (3) knowing violation of law, (4) financial profit or other advantage to which the director was not legally entitled, and (5) violations of section 719 of the Business Corporation Law. *Id.*[10]

To plead around an exculpatory clause under section 402(b), a complaint must contain factual, nonconclusory allegations that implicate one of these exceptions. *In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 474 (Bankr. S.D.N.Y. 2016). In his Opening Brief, Plaintiff/Appellant attempts to show that the allegations of the Complaint asserted non-exculpated conduct by the Clairvest Appellees during three separate time-frames: a sale process in late 2011 and early 2012 (which Plaintiff/Appellant refers to as the "First Sale Process"), a second sale process in 2012 and 2013 (which Plaintiff/Appellant refers to as the "*Second Sale Attempt*"), and in 2013 while LMI was in the process of completing the LMR Merger. For the reasons set forth below, this Court should reject Plaintiff/Appellant's arguments.

---

[10] Section 719 of the Business Corporation Law deals with factual scenarios – including dividends, share repurchases/redemptions and payments to shareholders after dissolution – which are not applicable in this case.

- 22 -

### 1.    The Complaint Fails to Plead a Plausible Claim that Clairvest Controlled the LMI Board of Directors

The arguments in the Opening Brief are predicated on the assumption, without factual support, that the Clairvest Entities controlled and dominated LMI's Board of directors because (i) Clairvest was the majority shareholder and (ii) it "controlled" a majority of the seats on the Board.[11] However, New York law is clear that Clairvest's position as majority shareholder "does not in and of itself spell domination." *Blaustein v. Pan Am. Petroleum & Transp. Co.*, 263 A.D. 97, 119, 31 N.Y.S.2d 934, 956 (1st Dep't 1941), *aff'd*, 293 N.Y. 281, 56 N.E.2d 705 (1944); *see Berger v. Fogarty*, 51 Misc. 2d 628, 629, 273 N.Y.S.2d 620, 622-23 (N.Y. Supr., N.Y. Co., 1965). Likewise, Clairvest's mere ability to <u>nominate</u> members of the board of directors is patently insufficient to establish actual domination and control. *See, e.g., Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F.Supp.2d 376, 397 (S.D.N.Y. 2013) (it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. A plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling); *Williamson v. Cox Commc'ns, Inc.*, No. CIV.A. 1663-N, 2006 WL

---

[11] Paragraphs 19 through 28 of the Complaint list the members of LMI's Board of Directors. (Clairvest Appx. Ex. 3, ¶¶19-28). The original Clairvest Directors were Defendants/Appellees David Sturdee, Aly Champsi, Alan Torrie and Sidney Horn. In November 2012, Sturdee resigned and was replaced by Kenneth Rotman.

158375, at *4 (Del. Ch. Ct. June 5, 2006) ("The fact that Cox and Comcast nominated directors to the At Home board does not, without more, establish actual domination and control"); *In re Sea-Land Corp. Shareholders Litig.*, No. CIV. A. 8453, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) ("Even if Simmons has caused its nominees to be elected to the Sea-Land Board … that fact alone, without more, does not establish actual domination and control").[12]

Plaintiff/Appellant's assertion that Clairvest "controlled" five seats on LMI's board of directors is dependent upon the recurring statement in the Opening Brief that Defendant/Appellant Rocco was "appointed" by Clairvest. (Opening Brief, pp. 8, 9, 33). Rocco was not "appointed" to the board by Clairvest. In 2002, in the original Shareholders Agreement, <u>Landauer</u> "nominated" Rocco to the board. [D.I. 122-1, ¶3.1, p. 18]. At that time, Rocco was the President of LMI. [D.I. 122-1, ¶3.9, p. 22]. When the Shareholders Agreement was amended in 2004, while Rocco was still LMI's President, Landauer's right to nominate directors decreased from four to three, so Clairvest nominated him. [D.I. 122-1, ¶3.1, p. 63]. Rocco's nomination to the board by Clairvest in 2004 no more evidenced Clairvest's control over Rocco than did Landauer's nomination of Rocco in 2002. Rocco's position on the Board was clearly linked to his position as President of LMI.

---

[12] As Judge Sontchi noted, courts look for guidance to Delaware case law on issues relating to fiduciary duty claims. *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, *8 (Bankr. D. Del. 2017).

- 24 -

The Complaint merely <u>assumes</u> the conclusion that Clairvest controlled Defendant/Appellant Rocco. As the Complaint alleges, however, Rocco openly opposed the LMR Merger (Clairvest Appx. Ex. 3, ¶¶129, 136-41, 150-54), and resigned from his position with LMI, with substantial negative consequences to the Clairvest Appellees. To argue that Clairvest dominated or controlled Rocco in light of these express allegations is nonsensical. Without particularized facts manifesting that Rocco's conduct as a board member comported with the wishes or interests of Clairvest, the Complaint fails under the pleading standard of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In an attempt to shore up the weakness in its theory that Clairvest controlled the LMI board, Plaintiff/Appellant asserts that "controlling shareholders are essentially the directors of the company" (Opening Brief, p. 31), and that "the actions of the Clairvest Board are imputed to the Clairvest Entities, and vice versa." (Opening Brief, p. 34). Plaintiff/Appellant cites no authorities for these purported principles of law, and they should accordingly be disregarded by this Court. Under New York law, a majority shareholder, *qua* shareholder, does not have any duty to manage the corporation. *In re Mundo Latino Market Inc.*, 590 B.R. 610, 616 (Bankr. S.D.N.Y. 2018). Plaintiff/Appellant has not alleged any control of LMI by the Clairvest Entities other than through the Clairvest Directors. Plaintiff/Appellant cannot leap-frog over the requirement that he make a plausible claim of Rocco's

domination by Clairvest, merely by reference to the majority shareholder position of the Clairvest Entities.

### 2. The Exculpatory Clause Bars the Claims Asserted from the First Sale Process

Even if this Court were to conclude that the Complaint sufficiently alleged Clairvest's control of the LMI Board, the Complaint does not plead around the Exculpatory Clause with respect to the First Sale Process.

According to Plaintiff/Appellant, the First Sale Process began in November 2011 and ended in May 2012. (Opening Brief, pp. 36, 41). The Complaint alleges that in November 2011 Clairvest, due to a "perceived uncertainty in the industry due to looming changes related to Competitive Bidding," exercised its rights under the Shareholders Agreement to sell LMI. (Clairvest Appx. Ex. 3, ¶68). At a November 4, 2011 LMI board meeting, the Board created a three-person subcommittee of Sturdee, Alan Landauer, LMI's Chairman and founder, and Louis P. Rocco, LMI's CEO and Board member, "to oversee the sale process." (Clairvest Appx. Ex. 3, ¶71.)

Plaintiff/Appellant concedes that Clairvest had the right to trigger the sale process in November 2011 pursuant to the Shareholders Agreement. (Opening Brief, p. 36). Plaintiff/Appellant further concedes that "Clairvest was seeking to maximize a sale price, and if achieved, all shareholders may have benefitted equally." (Opening Brief, p. 37). These two concessions, alone, entirely defeat any claim of fiduciary duty breach by the Clairvest Appellees during the First Sale Process.

According to Plaintiff/Appellant, the Clairvest Appellees pursued a sale they were entitled to initiate on terms that would benefit all shareholders.

So, what exactly did the Clairvest Appellees do wrong during the First Sale Process, according to Plaintiff/Appellant? In a nutshell, Plaintiff/Appellant asserts that during the First Sale Process the Clairvest Directors received offers for LMI for $70 million and failed to disclose them to the Board.[13] The Complaint's question-begging is most evident here. What, specifically, were the offers? The Complaint does not say, pleading their existence in the generic plural only on "information and belief." (Clairvest Appx. Ex. 3, ¶87). Who were the offers from? Again, the Complaint does not say. What were the terms and conditions of the offers; how did the offers prefer Clairvest's interests over the interests of other shareholders? The Complaint is silent. For all the sinister portrayal of Clairvest's motives and conduct during the First Sale Process, the Court is left to guess about the linchpin allegation – the supposed offers received by Clairvest during this period that were not disclosed or acted upon. In reality, the Complaint alleges no facts other than that the First Sale Process was properly initiated by Clairvest and ended without a successful sale. The rest is complete speculation.[14]

---

[13] Plaintiff/Appellant argues that a sale anywhere near $70 million would have been significantly better than the $22 million received in the sale after LMI filed bankruptcy. (Opening Brief, p. 40).

[14] Plaintiff/Appellant's argument that the Clairvest Appellees received offers for LMI but failed to disclose them to the Board because such offers would have been required to be accepted under the Shareholders Agreement (Opening Brief, pp. 39-40), is rank speculation.

The Complaint focuses significant attention on the hiring of RBC as the investment banker to assist with the First Sale Process. First, the Complaint alleges that LMI retained RBC solely because it was "obligated" to do so based upon a pre-existing relationship. (Clairvest Appx. Ex. 3, ¶69). To support this proposition, the Complaint quotes an email from Defendant/Appellee Sturdee to another investment bank that was not awarded the project. (*See id.*; D.I. 141-1, p. 2). However, the Complaint only *partially* and *selectively* quotes the email. Defendant Sturdee, in announcing to a bank that it had been unsuccessful in securing the engagement, stated that "we are obligated to give our institutional LPs a shot at mandates like this *where they have the subject matter expertise and experience, which they do in this case*." [D.I. 141-1, p. 2] (emphasis added). Putting aside the fact that the incorporated email establishes that Clairvest interviewed *other* potential banks for the assignment (thus wholly contradicting Plaintiff/Appellant's inference that Clairvest only considered RBC), the document further establishes that Clairvest examined RBC's *expertise and experience* in determining whether to offer it the assignment and did not do so out of any "obligation."

Second, Plaintiff/Appellant alleges that the Board did not even review the RBC engagement letter, and that Clairvest was so confident of RBC's retention, Defendant/Appellee Sturdee announced the retention even before the Board met to consider it. (Clairvest Appx. Ex. 3, ¶70). Again, the Complaint only partially quotes the email referenced therein and notes only that it was from Sturdee; it fails to

- 28 -

provide the full text or indicate to whom it was addressed. The email, dated October 31, 2011 — four days before the board meeting — was addressed to Brian Hand, LMI's corporate counsel *and Secretary to the Board*. (See id.). In that email, Sturdee requests that the Secretary "please review *the attached draft engagement letter*." [D.I. 141-2, p. 2] (emphasis added). Indeed, this directly contradicts the allegation that the Board was not provided with the draft RBC engagement letter before it considered the matter at its November 4, 2011 meeting.

Third, and most egregious, Plaintiff/Appellant alleges, based upon an email of February 27, 2012 referenced in the Complaint (Clairvest Appx. Ex. 3, ¶86), that Clairvest withheld critical information from RBC during the sale process and, accordingly, the Court may infer that Clairvest did the same with the Board. There is no logical basis to draw such an inference. Indeed, that would be contrary to common sense. The email from Sturdee to the Special Committee informed the members that they should not disclose to RBC "the lowest offer we would accept." [D.I. 141-3, p. 2]. The obvious reason is then given by Sturdee: "RBC gets paid almost the same if the company is valued at $90M or $100M. They need to believe we might walk away if we don't get adequate value." [D.I. 141-3, p. 2]. In short, Defendant/Appellee Sturdee, on the face of the email, was attempting to protect the interests of all LMI shareholders in getting the best price possible. Had Clairvest done otherwise, *i.e.,* disclose to RBC upfront the lowest price LMI would accept in

- 29 -

the sales process, Clairvest would have eliminated the incentive for RBC to obtain the highest possible price.

Lost in the cloud of dark insinuations is the simple fact that, under the Shareholders Agreement, Clairvest had the *right* to select LMI's investment advisor. [D.I. 100-7, ¶11.1(b), pp. 4-5]. While Clairvest's selection was subject to Landauer's consent, the Complaint alleges that the Board, including Landauer, *provided that consent* at the November 4, 2011 board meeting. (Clairvest Appx. Ex. 3, ¶72).

In his Opening Brief, Plaintiff/Appellant states that "a different investment banker would have considered all offers, and communicated all offers to the Board that engaged it." (Opening Brief, p. 38). The cart is again before the horse: what offers from the First Sale Process is Plaintiff/Appellant talking about? What offers should Clairvest and RBC have communicated to the Board? What did RBC fail to do that another investment banker would have done? The Bankruptcy Court correctly noted that Plaintiff/Appellant had failed to allege that a different investment banker "would have enabled LMI to reach a different result." *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606, *8 (Bankr. D. Del. 2017).

Plaintiff/Appellant also suggests that the integrity of the First Sale Process was undermined because the Special Committee was controlled by Clairvest. At its formation in November 2011, the Special Committee consisted of Sturdee, Rocco and Landauer. (Clairvest Appx. Ex. 3, ¶108). Because the Special Committee had been organized with a Clairvest-related director (Sturdee), an internal management

- 30 -

member (Rocco) and the Chairman (Landauer), Clairvest did not control the Special Committee. The Complaint merely <u>assumes</u> the conclusion that Clairvest controlled the Special Committee.

Plaintiff/Appellant likewise does not allege that the Clairvest Appellees received or would have received a personal benefit during the First Sale Process different in kind or character from other LMI shareholders. To plead around the Exculpation Clause, or to assert an actionable claim based on the duty of loyalty, Plaintiff/Appellant was required to allege that <u>a transaction actually occurred</u>. With no actual transaction having been consummated during the First Sale Process, Plaintiff/Appellant has not asserted non-exculpated claims, or claims based on a breach of the duty of loyalty.

Clairvest, as a majority shareholder, had the right to advance its economic interests.[15] *See, e.g., In re Midway Games Inc.*, 428 B.R. 303, 319 (Bankr. D. Del. 2010). Under the express terms of the Shareholders Agreement, Clairvest had the right to require LMI to initiate and complete a sale process. Nothing is alleged in the Complaint suggesting that during the First Sale Process, the Clairvest Appellees (1) were engaged in bad faith or intentional misconduct, (2) knowingly violated law,

---

[15] Plaintiff/Appellant states that during the First Sale Process, Clairvest sought to hold out for a 2x return on its original investment. (Opening Brief, p. 37). Even accepting that as true, Plaintiff/Appellant fails to allege how a higher sale price would have harmed other shareholders. Indeed, Plaintiff/Appellant concedes that "Clairvest was seeking to maximize a sale price, and if achieved, all shareholders may have benefitted equally." (Opening Brief, p. 37).

or (3) obtained financial profit or other advantage to which they were not legally entitled.

### 3.   The Exculpatory Clause Bars the Claims Asserted from the Second Sale Attempt

The Complaint likewise fails to plead around the Exculpatory Clause with respect to the Second Sale Attempt.

Although Plaintiff/Appellant declares in his Opening Brief that the Second Sale Attempt began in May 2012 (Opening Brief, p. 41), the factual background and arguments in the Opening Brief relating to the Second Sale Attempt focus on the period after January 30, 2013 (Opening Brief, pp. 13-16 and pp. 41-44), by which time LMI had already lost the Competitive Bidding process.

Once LMI was disqualified from Competitive Bidding for Medicare contracts, effective as of July 1, 2013 (Clairvest Appx. Ex. 3, ¶92), the Board minutes show that the LMI Board, including the Clairvest Directors, took substantial efforts to ensure the continued existence of LMI [*See, e.g.,* D.I. 100-2, pp. 2-4], including actively pursuing potential mergers with other companies, precisely the path that the Complaint alleges was in LMI's interest to protect it from the risks associated with Competitive Bidding. (Clairvest Appx. Ex. 3, ¶84). The Board minutes referenced in the Complaint show that the Board was briefed on the state of the sale process as it progressed (*see* Clairvest Appx. Ex. 3, ¶¶70, 78), and thoroughly deliberated the Allcare merger proposal and the LMR Merger proposal when they were presented,

including analyzing the Board's fiduciary duties to all constituencies. [D.I. 100-3, 100-4, 100-5].

Plaintiff/Appellant relies exclusively on conclusory assertions and partially quoted e-mails to support his claim of lack of LMI Board involvement and of the Clairvest Directors usurping control of the sale process to LMI's detriment. For example, while the Complaint references an email from Champsi to Rotman, in claiming that "Champsi had discussed a possible sale or merger with at least six different companies," (Clairvest Appx. Ex. 3, ¶100), the text of that email establishes that neither Champsi nor Clairvest was doing this *independent of the LMI Board*. As the email makes clear, Rocco, the President of LMI and a member of the Special Committee, took part in the contacts. [D.I. 100-8, p. 2]. Indeed, Rocco — not a Clairvest Director — executed the LOI with Allcare on behalf of LMI. [D.I. 100-9, pp. 2-7).[16]

The gist of Plaintiff/Appellant's argument with respect to the Second Sale Attempt is that during this period the Clairvest Appellees secretly sought a sale transaction that would prefer Clairvest's preferred stock interests over the interests of the LMI's common shareholders. The problem with this argument is that

---

[16] So too, when the Complaint alleges that Clairvest failed to make Landauer, the Chairman of LMI, aware of a potential Medstar Surgical deal until "late in negotiations," it quotes an email from Landauer to Champsi, noting that he was familiar with Medstar's CEO. (Clairvest Appx. Ex. 3, ¶120). While the Complaint suggests that this email came as late as May, the email quoted is from April 13, 2013, far from "late in any negotiations" and expressly references Landauer's knowledge of merger discussions with Medstar. [D.I. 100-10, p. 2].

Plaintiff/Appellant alleges no facts in the Complaint to support his conclusion. Rather, Plaintiff/Appellant again begs the question, using his conclusion as proof of itself.

In his Opening Brief, Plaintiff/Appellant states that: "Clairvest focused on maximizing value of preferred shares (sic) and pursuing 'creative ways to get Clairvest whole' (¶114) to the exclusion of common shareholders." (Opening Brief, p. 41). However, paragraph 114 of the Complaint, upon which he relies for this conclusion, alleges only that the Clairvest Directors were discussing a possible sale transaction with Quadrant. Plaintiff/Appellee does not allege that the Clairvest Directors actually proposed excluding LMI's common shareholders in connection with the Quadrant transaction. Nor does he allege that Quadrant made an actual offer which excluded common shareholders. The email quoted in paragraph 114 of the Complaint ("creative ways to get Clairvest whole") is from Quadrant to Rotman and Champsi. These are Quadrant's words, not those of the Clairvest Directors. No transaction was ever documented or consummated with Quadrant in which the Clairvest Appellees received preferred treatment.

Plaintiff/Appellant also argues that the Clairvest Appellees advanced their own interests as preferred stockholders in negotiations with Allcare. (Opening Brief, p. 42). However, as noted above, the Letter of Intent with Allcare provided that Allcare would acquire LMI by paying LMI's existing shareholders $33 million in cash and assuming LMI's debt. (Clairvest Appx. Ex. 3, ¶106). In the Complaint,

Plaintiff/Appellant conceded that "Allcare's valuation of LMI was higher than any other offer." (Clairvest Appx. Ex. 3, ¶118). The Opening Brief refers to the Allcare transaction as "viable." (Opening Brief, p. 53). There is no allegation in the Complaint that the Allcare transaction would have favored LMI's preferred stockholders. The Allcare transaction was approved by an 8-1 vote of the board, and fell apart not because of any action or inaction by the Clairvest Appellees, but solely because the U.S. Attorney General's office initiated a civil investigation demand regarding alleged violations of the Federal False Claims Act by LMI. (Clairvest Appx. Ex. 3, ¶¶125-126).

Plaintiff/Appellant has failed to plead any plausible claim that during the Second Sale Attempt the Clairvest Appellees personally profited from any proposed transaction, or that they would receive anything that differed from what other shareholders would receive. Plaintiff/Appellant's reliance on *In re Trados Inc. Shareholder Litigation*, 2009 WL 2225958 (Del. Ch. 2009), is entirely misplaced, and demonstrates in technicolor the question-begging on which the Complaint is founded. *Trados* involved a merger transaction which <u>actually closed</u>. In that merger transaction, $60 million was contributed by the merger partner, of which <u>$52 million was paid to preferred stockholders</u>. The remainder was distributed to the Company's executive officers pursuant to a previously approved bonus plan. <u>The common stockholders received nothing</u>. *Id.* at *1. The decision in *Trados* stands only for the obvious proposition that a board of directors can, in certain factual situations, breach

their fiduciary duty to common shareholders when their *approval of an actual transaction* unfairly favors preferred stockholders. In this case, no transaction was voted upon by the Clairvest Directors or consummated which favored the preferred stockholder interests of the Clairvest Appellees. The legal principles relied upon by the court in *Trados* simply have no application to the facts in this case and the underlying facts are clearly distinguishable from those here.

While Plaintiff/Appellant peppers the Complaint with the phrases "bad faith" and "waste", these conclusory assertions alone, as the Bankruptcy Court found, are insufficient to plausibly plead bad faith under New York law. *See, e.g., Stern v. Gen. Elec. Co.*, 837 F. Supp. 72, 76 (S.D.N.Y. 1993) *aff'd,* 23 F.3d 746 (2d Cir. 1994). Bad faith requires "either subjective bad faith where the fiduciary is motivated by an actual intent to do harm, or a conscious disregard of one's fiduciary duties involving 'misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision.'" *Ampal-Am.*, 543 B.R. at 475 (internal citations omitted).

Nothing is alleged in the Complaint or argued in the Opening Brief suggesting that during the Second Sale Attempt, the Clairvest Appellees (1) were engaged in bad faith or intentional misconduct, (2) knowingly violated law, or (3) obtained financial profit or other advantage to which they were not legally entitled. Accordingly, the claims in Counts I and II of the Complaint are not supported by

any allegations relating to the Second Sale Attempt, but are instead barred by the Exculpatory Clause.

### 4. The Exculpatory Clause Bars the Claims Asserted from the Failed LMR Merger

Plaintiff/Appellant argues that Counts I and II of the Complaint plead around the Exculpatory Clause because of allegations in the Complaint that the Clairvest Appellees violated various healthcare laws in connection with the failed LMR Merger. Specifically, Plaintiff/Appellant argues that it properly plead (i) knowing violations of healthcare laws on the part of Clairvest (Clairvest Appx. Ex. 3, ¶¶31-33); and (ii) intentional misconduct in the form of fraudulent payments (Clairvest Appx. Ex. 3, ¶¶34-35).

For instance, the Complaint alleges that Champsi and Pirzada [Medstar's CEO] "told Rocco that they intended to operate the merged companies in violation of the law" until certain compliance issues were resolved. (Clairvest Appx. Ex. 3, ¶135). But the Complaint later alleges that "Clairvest proposed certain work-around solutions . . . to comply with Medicare regulations." (Clairvest Appx. Ex. 3, ¶148). Merely because, as the Complaint alleges, LMI's compliance officer did not agree with these solutions, does not mean the Clairvest Directors were *knowingly* violating the law. Rather, the Complaint depicts responsible Clairvest Directors who were taking the actions required to *ensure* compliance with the law.

These types of conclusory allegations of illegality have been rejected by courts on motions to dismiss time and time again as insufficient to allege a breach

- 37 -

11153589

of fiduciary duty. *See, e.g., In re Hecla Min. Co. Derivative S'holder Litig.*, No. 2:12-CV-000119-MHW, 2014 WL 689036, at *9 (D. Idaho Feb. 20, 2014) (As to Plaintiff's allegation that the defendants actively caused or permitted Hecla to violate mine safety law, "Plaintiffs provide no allegations of fact beyond these conclusory assertions regarding either the information made available to the board or what the board did in response to such information…. Simply put, more is needed."); *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) ("[T]he Complaint alleges many violations of federal securities and tax laws but does not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal."); *Rattner v. Bidzos*, No. CIV.A. 19700, 2003 WL 22284323, *6 (Del. Ch. Sept. 30, 2003) (same). The Bankruptcy Court properly rejected such allegations here.

Additionally, from the circumstances surrounding the transfer of funds from LMI to Rite Care and Medstar as part of the proposed merger — the corporate waste alleged in the Complaint — it is clear that, although the merger process had commenced, the LMR Merger had not closed before LMI lost its rights to take Medicare orders due to losing the Competitive Bidding process. (Clairvest Appx. Ex. 3, ¶145). While the Complaint attempts to paint a picture of gratuitous payments from LMI to Rite Care and Medstar for no apparent purpose (Clairvest Appx. Ex. 3, ¶¶145-46), the Complaint also alleges in these paragraphs that "Rite Care faced significant problems in keeping up with the increased volume [of Medicare orders]"

- 38 -

11153589

(Clairvest Appx. Ex. 3, ¶145). The Complaint never alleges that such transfers were made in bad faith or with the intent to defraud. Rather, it is clear from the Complaint that these payments were made in connection with the LMR Merger, at a time when all involved expected that the merger would be completed, and not for some illicit purpose.

Similarly, the argument that Clairvest "participated in intentional misconduct" during the LMR Merger process is insufficient to plead around the Exculpatory Clause. This claim has to do with the alleged transfer of the grand sum of $104,922.16 in four payments from LMI to CGM for unspecified services. (Clairvest Appx. Ex. 3, ¶¶282-283). How the alleged transfer of this minor amount relates to a breach of fiduciary duty claim concerning sale efforts is a complete mystery. Plaintiff/Appellant's attempt to use these minor transfers in May 2013 to circumvent the Exculpatory Clause is unavailing. These conclusory allegations of intentional misconduct do not satisfy Plaintiff/Appellant's burden. Reference to conclusory allegations of "intentional misconduct" simply are insufficient to plead around the Exculpatory Clause under New York law. *See, e.g., In re Ampal-Am. Israel Corp.*, 543 B.R. at 474; *Teachers' Ret. Sys. of Louisiana v. Welch*, 244 A.D.2d 231, 232, 664 N.Y.S.2d 38, 39 (1st Dep't 1997).

### 5. The Bankruptcy Court Properly Concluded that the Complaint Failed to Plead that the Clairvest Appellees Caused Damage to LMI

Counts I and II fail for another, more basic reason — lack of causation. A breach of fiduciary duty is only actionable if the breach caused the damages in question. *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 800 (Bankr. S.D.N.Y. 2012). To show causation, a plaintiff must show (1) cause in fact and (2) proximate cause. *Koplik*, 476 B.R. at 800-01.

Here, the Complaint establishes that the Clairvest Appellees' alleged actions did not cause Plaintiff's asserted damages. Rather, the U.S. Department of Justice's investigation caused the Allcare proposal, already approved by the LMI board, to disintegrate. (Clairvest Appx. Ex. 3, ¶¶124-25). Thereafter, with LMI on the verge of being saved by TD Bank's consent to the LMR Merger, the exodus of Rocco and Burdi, including those who worked with them, caused TD Bank to withhold its consent and declare a material adverse change. (Clairvest Appx. Ex. 3, ¶159). These are the factors asserted in the Complaint to have caused LMI's downfall. They are not, under any standard of plausibility, the result of any actions on the part of the Clairvest Appellees.

In his Opening Brief, Plaintiff/Appellant argues that because the Clairvest Appellees breached fiduciary duties before these events, causation is sufficiently alleged. (Opening Brief, p. 43). This argument again begs the question. As demonstrated above, Plaintiff/Appellant has not established the premise – a plausible

- 40 -

case that the Clairvest Appellees breached their fiduciary duties. Plaintiff/Appellant's circular reasoning continues when he argues that Judge Sontchi was wrong to conclude that that the Clairvest Appellee's "actions were excused by intervening factors, because Clairvest did not receive a personal benefit." (Opening Brief, p. 43). No. Judge Sontchi determined that the Clairvest Appellee's actions were <u>exculpated</u> because they did not receive a personal benefit. Likewise, Judge Sontchi did not use TD Bank's withdrawal of consent as an "intervening cause" to excuse bad faith by the Clairvest Appellees. (Opening Brief, p. 44). Rather, he held that the allegations of bad faith against the Clairvest Appellees were conclusory and legally insufficient under New York law.

Moreover, the Complaint expressly uses the allegation of TD Bank's withdrawal of consent to then attack Defendants Rocco and Burdi for leaving LMI, the event that the Complaint alleges caused the downward spiral of LMI. (Clairvest Appx. Ex. 3, ¶159). Plaintiff/Appellant cannot have it both ways: arguing on the one hand that the Clairvest Appellees' actions caused LMI's downfall and arguing on the other hand that Rocco and Burdi's departure were the precipitating cause. In the words of Alan Landauer, LMI's chairman and a non-defendant, the "failed Allcare transaction and the events that followed – including Allcare's improper solicitation and hiring away of Debtors' senior employees – irreparably harmed the Debtors' business and were *a primary cause of the Debtors' need to seek bankruptcy protection*." [D.I. 100-6, ¶44, p. 16] (emphasis added).

- 41 -

11153589

### C.     The Bankruptcy Court Did Not Abuse Its Discretion in Dismissing the Complaint with Prejudice

Plaintiff/Appellant argues that the Bankruptcy Court should have granted him leave to replead. The decision to grant leave to replead rested squarely in the discretion of the Bankruptcy Court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Amending a complaint is not a right: an amendment may be denied where, among other things, leave to amend would lead to undue delay or would be futile. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Futility exists where the complaint, as amended, would fail to state a claim upon which relief could be granted and would be immediately subject to dismissal. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

The Exculpatory Clause, as a matter of law, shields the Clairvest Appellees from a breach of the duty of care claim – the only type of fiduciary duty claim the Bankruptcy Court held was asserted in the Complaint. The Bankruptcy Court properly concluded that any attempt to plead around the Exculpatory Clause would be futile in this case. Plaintiff/Appellant failed to identify new facts or arguments in the Reconsideration Motion (no amended complaint was proffered by Plaintiff/Appellee). This Court should affirm.


[*Remainder of page intentionally left blank*]

## V.    CONCLUSION

The Complaint in this case is an attempt to rewrite history concerning the circumstances which led to the Debtors' bankruptcy filing. Plaintiff/Appellant's hindsight and conclusion driven narrative is contradicted by the facts as they occurred in real time. For the foregoing reasons, the Clairvest Appellees respectfully request that this Court affirm the Clairvest Dismissal Order in all respects.


Dated: September 6, 2019                Respectfully Submitted,

                                        MORRIS JAMES LLP

                                        /s/   *Stephen M. Miller*
                                        Stephen M. Miller (DE Bar No. 2610)
                                        500 Delaware Avenue, Suite 1500
                                        Wilmington, DE  19899-2306
                                        Telephone: (302) 888-6800
                                        Facsimile: (302) 571-1750
                                        E-mail: smiller@morrisjames.com

                                        -and-

                                        David T.B. Audley (*pro hac vice*)
                                        Michael T. Benz (*pro hac vice*)
                                        CHAPMAN AND CUTLER LLP
                                        111 West Monroe Street
                                        Chicago, IL  60603-4080
                                        Telephone: (312) 845-3000
                                        Facsimile: (312) 701-2361
                                        E-mail: audley@chapman.com
                                        E-mail: benz@chapman.com

                                        *Attorneys for Clairvest Appellees*

- 43 -

11153589

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2019, I electronically filed the foregoing document with the Clerk of the Court for the Clerk of the Court of the United States District Court, District of Delaware, by using the CM/ECF system.

I certify that all parties of record to this appeal either are registered CM/ECF users, or have registered for electronic service, or have consented in writing to electronic service and that service will be accomplished through the CM/ECF system.

The parties of record who are being served through the CM/ECF system are as follows:

*Attorneys for Plaintiff/Appellant*
*(by ECF and email service):*

James S. Green Jr.
Matthew R. Pierce
Nicolas E. Jenner
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE  19801
Phone: (302) 467-4400
green@lrclaw.com
pierce@lrclaw.com
jenner@lrclaw.com

*Attorneys for Defendants/Appellees Rocco and Burdi*
*(by ECF and email service):*

Gregory W. Fox, Esquire
Sarah Kleinman, Esquire
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
2000 Market Street
Philadelphia, PA  19103
Phone: (215) 575-2827
Fax : (215) 575-0856
GWFox@mdwcg.com
SAKleinman@mdwcg.com

Art C. Aranilla
MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN
1007 North Orange Street, Suite 600
P.O. Box 8888
Wilmington, DE  19899-8888
acaranilla@mdwcg.com

Dated: September 6, 2019         Respectfully Submitted,

MORRIS JAMES LLP

By: /s/    *Stephen M. Miller*
         *Attorneys for Clairvest Appellees*

11153589

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Bankruptcy Procedure 8015(a)(7), the undersigned certifies that the Response Brief of the Clairvest Appellees complies with the type-volume limitation and that the Clairvest Appellees' Response Brief contains 9768 words (excluding all matters exempted by FRBP 8015(g)) as counted by the computer program used to prepare the Response Brief. This document also complies with the typeface requirements of FRBP 8015(a)(5) and the type-style requirements of FRBP 8015(a)(6) because the document was prepared using the Times type style in 14-point font.

Dated: September 6, 2019
<br>

Respectfully Submitted,

MORRIS JAMES LLP

By: */s/    Stephen M. Miller*
<br>*Attorneys for Clairvest Appellees*

11153589