IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE LMI LEGACY HOLDINGS, INC., *et al.*, | : | Chapter 11 |
| | : | Bankr. No. 13-12098 (KBO) |
| Reorganized Debtors. | : | (Jointly Administered) |

| | | |
|---|---|---|
| EDWARD L. LIPSCOMB, AS SPECIAL TRUSTEE OF THE LMI GUC TRUST, | : | Adv. No. 15-51069 (KBO) |
| | : | |
| Appellant, | : | |
| v. | : | Civ. No. 19-887-CFC |
| | : | |
| CLAIRVEST EQUITY PARTNERS LIMITED PARTNERSHIP, *et al.*, | : | |
| | : | |
| Appellee. | : | |

James S. Green, Jr., Matthew R. Pierce, Nicolas E. Jenner, LANDIS RATH & COBB LLP, Wilmington, Delaware

   *Counsel for Appellant*

Steven M. Miller, MORRIS JAMES LLP, Wilmington, Delaware; David T.B. Audley, Michael T. Benz, CHAPMAN AND CUTLER LLP, Chicago, Illinois

   *Counsel for Clairvest Appellees*

Art C. Aranilla, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Wilmington, Delaware; Gregory W. Fox, Carol A. VanderWoude, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, Philadelphia, Pennsylvania

   *Counsel for Appellees Louis P. Rocco and Saverio Burdi*

**<u>MEMORANDUM OPINION</u>**

December 14, 2020
Wilmington, Delaware

_____

CONNOLLY, UNITED STATES DISTRICT JUDGE

## I.   INTRODUCTION

Appellant Edward L. Lipscomb, as special trustee ("Trustee") of the LMI

GUC Trust created in the Chapter 11 cases of the above-captioned reorganized

debtors, and plaintiff in the above-captioned adversary proceeding, appeals the

Decision, *In re LMI Legacy Holdings, Inc.*, 2017 WL 1508606 (Bankr. D. Del.

Apr. 27, 2017) (Adv. D.I. 188)[1] and Order (Adv. D.I. 189) dismissing with

prejudice the Trustee's breach of fiduciary duty claims set forth in Counts I, II, and

III of Trustee's complaint (Adv. D.I. 4; Appx. Ex. 3) ("Complaint") against

defendants: (i) Clairvest Equity Partners Limited Partnership, Clairvest Group,

Inc.,  Clairvest Acquisition LLC, and Clairvest GP Manageco, Inc. (together, the

"Clairvest Entities"); (ii) David Sturdee; Kenneth Rotman, Aly Champsi, Sidney

Horn, and Alan Torrie (together, the "Clairvest Directors," and together with the

Clairvest Entities, "Clairvest Appellees"); and (iii) defendants Louis Rocco

_____

[1] The docket of the Chapter 11 cases, captioned *In re LMI Legacy Holdings, Inc.*,
No. 13-12098 (KBO) (Bankr. D. Del.), is cited herein as B.D.I. __," and the docket
of the adversary proceeding, captioned *Lipscomb v. Clairvest Equity Partners
Limited Partnership*, Adv. No. 15-51069 (KBO) (Bankr. D. Del.), is cited herein as
"Adv. D.I. __." The appendix (D.I. 15) filed by the Clairvest Appellees in support
of their answering brief (D.I. 14) is cited herein as 'Appx. __."

("Rocco") and Saverio Burdi ("Burdi"). For the reasons set forth herein, the Court affirms the dismissal of Counts I, II, and III of the Complaint.

## II.    BACKGROUND

### A.    The Debtors and the Parties to the Appeal

Alan Landauer ("Landauer") formed Landauer Metropolitan, Inc. ("LMI" and, together with its affiliates, the "Debtors") in 1999 upon merging his family business with another home health care services and products company. (D.I. 10 at 4). Before filing for bankruptcy in 2013, LMI operated as a regional home medical equipment supplier in the northern United States. (Complaint ¶ 36). The majority of LMI's sales and rentals were historically paid for through third-party payor groups, such as Medicare. (*Id.* ¶ 37). In 2003, Congress enacted legislation requiring a competitive bidding process for many of the items sold and rented by LMI ("Competitive Bidding"). (*Id.* ¶ 38). As a supplier, LMI was compelled to take part in the process to secure Medicare contracts. (*Id.*) The Competitive Bidding process is run by the Center for Medicare Services ("CMS"), and bids are evaluated based on the bidder's eligibility, financial stability, and the bid price. (*Id.*) Approximately 35% of LMI's historical revenues were derived directly from Medicare and Medicaid programs. (*Id.* ¶¶ 37-39).

Clairvest is a Toronto-based equity firm and was LMI's controlling shareholder prior to the bankruptcy. (*Id.* ¶ 2, 40). Clairvest began investing in

2

LMI through its private equity funds in December 2002 and quickly obtained a controlling position in LMI. (*Id.* ¶ 42). On the petition date, Clairvest owned a 62.5% equity interest in LMI. (*Id.* ¶ 40). Clairvest also controlled LMI's Board through its power to nominate five of the nine members of LMI's Board (the "Clairvest Directors" and "Board," respectively). Clairvest Directors Sturdee, Rotman, and Champsi were members of the nine-person LMI Board of Directors and were also employed at Clairvest.[2] (*Id.* ¶¶ 19-21). Clairvest Directors Torrie and Horn were also members of the LMI Board, having been nominated by Clairvest. (*Id.* ¶¶ 27-28). Defendant Rocco was a Board Member, President and CEO of LMI. (*Id.* ¶¶ 6, 22). Defendant Burdi was LMI's Executive Vice President of Sales and was not a Director. (*Id.* ¶ 23).

On August 16, 2013, the Debtors filed voluntary petitions for bankruptcy relief under chapter 11 of the Bankruptcy Code. (*Id.* ¶ 32). Clairvest held a claim against the estate for $5.2 million derived from three loans made to LMI between March 2010 and February 2011, which claim accounted for approximately 30% of the Debtors' estimated general unsecured creditor pool. (*Id.* ¶ 43). On March 13, 2014, the Debtors filed their joint plan of liquidation (B.D.I. 650) (as amended and modified, the "Plan"). On April 28, 2014, the Bankruptcy Court entered an order

---

[2] In November 2012, Sturdee resigned and was replaced on the LMI Board by Rotman. (Complaint, ¶¶ 19-20). They did not serve on the Board at the same time.

confirming the Plan (B.D.I. 761) (the "Confirmation Order"). On May 1, 2014, the

Plan became effective. (Complaint ¶ 14). Under the Plan and Confirmation Order,

as well as a settlement agreement approved by the Bankruptcy Court (B.D.I. 282),

the right to prosecute the claims asserted in the Complaint were transferred to the

"GUC Trust" – a trust established for the benefit of the holders of allowed general

unsecured claims asserted against the Debtors. Trustee is the Special Trustee of

the GUC Trust. (Complaint ¶¶ 15-17).

### B.    The Complaint

Following a number of years of growth, LMI's revenue peaked in 2011 with

reported net revenue of $139,656,000. LMI's net revenue fell slightly in fiscal

year 2012 to $137,160,000 and again in fiscal year 2013 to $128,500,000. *LMI*

*Legacy*, 2017 WL 1508606 at *2. The primary cause of LMI's bankruptcy filing

was not its profitability or cashflow in from 2011 to 2013 but rather LMI's failure

to win a single services area in Medicare's 2013 Competitive Bidding. (*Id.*;

Complaint ¶¶ 35-40). LMI's bids were rejected despite their competitive pricing

based on CMS's determination that LMI might not be financially able to provide

the services upon which it bid. (B.D.I. 100-6, 8/20/2013 Hr'g Tr. at 6:15-24

(Debtors' first day hearing)).

The Complaint alleges that in 2011, Clairvest initiated a sale process for

LMI and signed an engagement letter with RBC Capital Markets, LLC ("RBC") as

its investment banker before involving non-LMI Board Members. (*Id.* ¶¶ 69-71).

RBC was an investor in a separate Clairvest fund, and this preexisting relationship

was not disclosed to the Board. (*Id.* at ¶¶ 69-73). The Trustee concedes that,

under the Shareholder Agreement, Clairvest had the right to require LMI to initiate

a sale process (D.I. 10 at 36; *see also* Adv. D.I. 100-7, ¶ 11.1(b) at 4-5

(Shareholders Agreement)), and Clairvest had the right to select LMI's investment

advisor. (Adv. D.I. 100-7, ¶ 11.1(b) at 4-5). The Complaint asserts that,

notwithstanding these rights, final approval of the investment banker was reserved

to Landauer, which Clairvest did not obtain the consent prior to RBC's

engagement.

At a November 4, 2011 LMI Board meeting, the Board created a three-

person subcommittee, including Sturdee (nominated by Clairvest), Landauer,

LMI's founder and chairman, and Rocco, LMI's President, "to oversee the sale

process." (*Id.* ¶ 71). The Complaint alleges that this Committee was a sham and

that the LMI Board left the sale process entirely to the Clairvest Appellees. (*Id.* ¶¶

2-4).

The initial sale process ended in May of 2012 without a single acceptable

bid having been received. (*Id.* ¶ 78). It is unclear what constituted an acceptable

bid," but the Trustee alleges that Clairvest – not LMI – had provided RBC with

guidelines for what would be acceptable. The Trustee believes that Clairvest

5

received offers that valued LMI in excess of $70 million.  (*Id.* ¶ 87).  Trustee speculates that bids for LMI were received but withheld based on a provision in the Shareholders Agreement which would have required the bids to be accepted.  (D.I. 10 at 39-40).

The Complaint alleges that once the sale process yielded no buyers, the Board ignored the potential negative financial impact to LMI of the new Competitive Bidding requirements by not pursuing strategic partnerships with other companies that also had Medicare licenses, thus hedging against the loss of business resulting from Competitive Bidding.  The Complaint alleges this strategy, "would have been a strategy to prevent these Chapter 11 cases." (Complaint ¶ 84). Citing a Clairvest internal memorandum of February 2012, the Complaint alleges that LMI's Board, at Clairvest's direction, ignored this option because the Clairvest Appellees were interested only in liquidating Clairvest's investment in LMI. (*Id.* ¶ 83).

On or about January 30, 2013, LMI learned that it had been disqualified from round two of Competitive Bidding and had not "won any bids." (*Id.* ¶ 92). As a consequence, as of July 1, 2013, LMI would not have any contracts to supply products to new Medicare patients.  (*Id.* ¶ 92).

Clairvest apparently anticipated the 2013 negative ruling from CMS and had already renewed its effort to sell LMI. *See LMI Legacy*, 2017 WL 1508606 at *2.

The Complaint alleges that Clairvest, on its own, commenced new efforts to negotiate a sale of LMI, and that, by the end of January of 2013, Clairvest had negotiated a non-disclosure agreement with a potential suitor. (Complaint ¶ 95). The Complaint alleges that by April 2013, Champsi had "discussed a possible sale or merger" of LMI with at least six companies: Allcare, Bioscript, Lincare, Quadrant, Medstar Surgical, and Community. (*Id.* ¶ 100).

By March 2013, Clairvest had begun negotiating with Passaic Healthcare Services, LLC d/b/a Allcare Medical ("Allcare"). Notwithstanding these actions by Clairvest, it was not until March 4, 2013 that LMI's Board met to begin discussing, for the first time since CMS's adverse ruling, LMI's sale and merger options. The minutes appear to show that Clairvest and its Board Members did not disclose the negotiations with Allcare, the letter of intent Clairvest had received from Allcare that day, or discuss RBC's involvement in the new sale process. (*Id.* ¶¶ 95-96).

Over the following months, a number of transactions were explored by the Board. Board Members independently pursued different potential transactions, which resulted in growing internal strife. (*Id.* ¶¶ 98-103).

On April 29, 2013, a nonbinding Letter of Intent with Allcare was executed, providing that Allcare would acquire LMI by paying LMI's existing shareholders $33 million in cash and assuming LMI's debt. (*Id.* ¶ 106). The Trustee alleges

that there are no Board minutes indicating that the Board approved this sale or was aware that this LOI had been executed. (*Id.* ¶¶ 106-108). The Trustee alleges that after receiving offers from two other companies, Clairvest sought to expeditiously finalize a deal with Allcare, exclusive of Board consideration. (*Id.* ¶ 117). At the May 13, 2013 Board meeting Champsi – not RBC nor the Special Committee – provided updates regarding the various potential transactions being pursued and the process to date. (*Id.* ¶ 121). Champsi reported that the most serious proposal received was from Allcare. (*Id.*) The minutes of the Board meeting reflect an extended discussion regarding the potential transactions. Discussion thereafter was held on the issue of whether the Board should pursue the Allcare transaction or whether the Board should maintain the status quo and not approve any proposed transaction. (Adv. D.I. 100-3 at 3). At the discussion's end, the Board, by an 8-1 vote, submitted the Allcare transaction to the shareholders for approval and authorized management to take all actions necessary to consummate the transaction. (*Id.*) Thereafter, on May 15, 2013, LMI entered into a standstill agreement with Allcare. (Complaint ¶ 122). On May 16, 2013, Allcare and LMI issued a press release announcing their merger. (*Id.* ¶ 123).

However, on May 20, 2013, LMI was notified that the U.S. Attorney General's office had initiated a civil investigative demand ("CID") with respect to alleged violations by LMI under the Federal False Claims Act. (*Id.* ¶ 124). When

LMI notified Allcare of the CID, Allcare demanded renegotiation of the previously announced merger agreement, with the aim of mitigating any potential risk associated with the CID. (*Id.* ¶ 125).

Champsi requested that Allcare waive its rights under the standstill agreement to permit LMI to meet with Medstar Surgical and Ocean Medical over a potential alternative deal, and merger talks broadened to include those two other companies. (*Id.* ¶¶ 126-127). At that time, Rite Care also expressed an interest in joining the proposed merger. (*Id.* ¶128). The LMI Board then held a two-day meeting on June 3-4, 2013 to discuss the new proposals, including the revised Allcare proposal. (*Id.* ¶ 129; Adv .D.I. 100-4 at 2-3; Adv. .D.I. 100-5 at 2-3). At the conclusion of this two-day meeting, the LMI Board unanimously agreed to proceed with the Medstar and Ocean transactions, including LMI entering into a triangular merger with a new holding company pursuant to which LMI's shareholders would receive a combination of common stock and debt of the new holding company. (Adv. D.I. 100-5 at 2). Thereafter, Ocean backed out of the merger and Rite Care replaced Ocean under a new merger arrangement (the "LMR Merger"). (Complaint ¶ 134). On June 17, 2013, the LMR Merger was approved at a special meeting of shareholders. (*Id.*)

Under the merged company, Rocco was to be designated as the co-CEO with Zeb Pirzada ("Pirzada"), the CEO of Medstar Surgical, an arrangement with which

Rocco had expressed dissatisfaction, but in favor of which he nonetheless voted. (*Id.* ¶¶ 136-38). The Complaint alleges that immediately thereafter, LMI began having difficulty implementing the merger due to certain non-compliance issues. The Complaint alleges that notwithstanding these issues, Champsi and Pirzada alerted Rocco that they intended to operate the merged companies "in violation of the law" until management could resolve the non-compliance issues. (*Id.* ¶ 135). To remedy the issue of non-compliance, Clairvest proposed certain work-around solutions, including a subcontracting arrangement under which LMI could comply with Medicare regulations and use Rite Care's Medicare contracts. (*Id.* ¶ 148). Although the merger was not yet finalized, the Complaint alleges that LMI transferred a total of $300,000 to Medstar on June 20, 2013, June 27, 2013 and July 3, 2013. (*Id.* ¶ 146).

By early July 2013, TD Bank, one of LMI's lenders, had not yet approved the LMR Merger. (*Id.* ¶¶ 145-46). As a result, LMI could not take any Medicare orders, instead having to forward them to Rite Care. (*Id.* ¶ 145). On July 10, 2013, LMI reached a compromise with TD Bank, whereby the bank would consent to the LMR Merger and later be responsible for an intercreditor agreement with Medstar. (*Id.* ¶ 149). The Complaint asserts that "[t]his compromise would have led to the consent from TD Bank required to consummate the LMR Merger, potentially ultimately saving [LMI]." (*Id.*).

Within hours of reaching this compromise with TD Bank, however, Rocco and Burdi resigned from their positions at LMI and joined Allcare, persuading key LMI employees to join them. (*Id.* ¶¶ 150-154). As a direct result of Rocco and Burdi's resignations, TD Bank withheld its consent to the LMR Merger and declared a material adverse change under its credit agreement with LMI. (*Id.* ¶ 159). In July 2013 LMI's senior secured lenders asserted that an event of default had occurred and began restricting LMI's access to cash collateral. (*Id.* ¶ 47).

Adam Landauer, LMI's chairman and non-defendant stated that the "failed Allcare transaction and the events that followed – including Allcare's improper solicitation and hiring away of Debtors' senior employees – irreparably harmed the Debtors' business and were a primary cause of the Debtors' need to seek bankruptcy protection." (Adv. D.I. 100-6, ¶ 44 at 16) (emphasis added)).

LMI and its affiliates declared bankruptcy on August 16, 2013, with a pre-negotiated stalking horse purchaser, Quadrant Management Inc., and a plan to sell the Debtors' business at auction. (*Id.* ¶¶ 49-50).

On August 14, 2015, the Trustee filed his Complaint alleging eighteen claims against various parties associated with LMI, Clairvest, and the failed LMR Merger. In Counts I and II of the Complaint, Trustee seeks to hold the Clairvest Appellees liable for LMI's bankruptcy filing and the associated economic losses by alleging that they breached their fiduciary duties to LMI and its shareholders.

Count I alleged breach of fiduciary duties against LMI's Board (Complaint ¶¶ 161-171); Count II alleged breach of fiduciary duties against the Clairvest Appellees (*id.* ¶¶ 172-188); and Count III alleged breach of fiduciary duties against Rocco and Burdi as officers of LMI (*id.* ¶¶ 6, 22).

### C. Motions to Dismiss

The Clairvest Appellees challenged the allegations in the Complaint by filing a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7012) (the "Clairvest Dismissal Motion"). (Adv. D.I. 98). The Clairvest Dismissal Motion sought dismissal of all counts in the Complaint against the Clairvest Appellees, which include Counts I, II, X, XI, XII, XV, XVI, XVII and XVIII. Motions to dismiss were filed as well by the other defendants (Adv. D.I. 96, 101, 108) (together with the Clairvest Dismissal Motion, the "Dismissal Motions").

On February 23, 2017, the Honorable Christopher S. Sontchi[3] held oral argument on the Dismissal Motions. (Appx. Ex. 4 (2/23/2017 Hr'g Tr.)). On April 27, 2017, Judge Sontchi entered the Decision determining, *inter alia*, that the breach of fiduciary duty claims in Counts I, II, and III would be dismissed with

---

[3] LMI's Chapter 11 cases, including this adversary proceeding, have since been reassigned to the Honorable Karen B. Owens.

prejudice, *LMI Legacy*, 2017 WL 1508606, *17, along with the accompanying Order (Appx. Ex. 1).

In the Decision, the Bankruptcy Court addressed the allegations in Counts I and II of the Complaint against the backdrop of the exculpatory clause in LMI's certificate of incorporation (the "Exculpatory Clause"), which provided:

> No director shall be personally liable to the corporation or its shareholders for damages for any breach of duty in such capacity, except that this provision shall not eliminate or limit the liability of any director (i) if a judgement or other final adjunction adverse to such director establishes that such director's acts or omissions with in bad faith or involved intentional misconduct or a knowing violation of law or that such director personally gained in fact a financial profit or other advantage to which such director was not legally entitled or that such director's acts violated Section 719 of the Business Corporation law of (ii) for any act or omission prior to the adoption of this provision.[4]

Judge Sontchi applied New York law,[5] which dictates that fiduciary duty claims premised on the breach of the "duty of care" are unavailable when certificate of incorporation language like the Exculpatory Clause has been adopted by the corporation for the protection of its directors. *LMI Legacy*, 2017 WL 1508606, at *4-5. Judge Sontchi held that the allegations against the Clairvest Appellees in Counts I and II essentially charging the Clairvest Appellees with negligent acts and

---

[4] The Exculpatory Clause can be found in LMI's certificate of incorporation at Adv. D.I. 100-15 at 4, 30.

[5] Although the issue was contested below, the Trustee now concedes that New York law applies to this appeal. (D.I. 17 at 28).

omissions, were "duty of care claims, and not duty of loyalty claims," *id*. at *9, and were accordingly barred by the Exculpatory Clause.

Judge Sontchi further held that the Trustee failed to plead around the Exculpatory Clause by alleging a plausible claim that the Clairvest Appellees acted in bad faith, engaged in intentional misconduct, or received a personal benefit. *Id*. at *8. Judge Sontchi determined that the Clairvest Appellees were accordingly entitled to the benefit of the "business judgment rule." *Id*. at *9. Judge Sontchi therefore dismissed Counts I and II of the Complaint against the Clairvest Appellees with prejudice. For the same reasons, the Bankruptcy Court dismissed Count I against Rocco and Count III against both Rocco and Burdi with prejudice. *Id*. The Decision indicated that dismissal was with prejudice but stated no reason to support a denial of the Trustee's opportunity to amend. *See id*.

The Counts of the Complaint not dismissed in the Order were dismissed by the Bankruptcy Court upon agreement of the parties. (D.I. 10 at 22-23). In addition, Trustee states in his opening brief that he does not appeal the dismissal of Count XII against the Clairvest Appellees. (*Id*. at 23). Accordingly, this appeal of the Decision and Order relates only to the dismissal of Counts I, II, and III.

### D.   Motion for Reconsideration

On May 11, 2017, the Trustee moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) (made applicable by Federal Rule of Bankruptcy

14

Procedure 9023) (Adv. D.I. 190) ("Reconsideration Motion").  On August 10,

2017, after the Reconsideration Motion was fully briefed, the Bankruptcy Court

entered a Memorandum Order denying the motion (the "Reconsideration

Decision").  *In re LMI Legacy Holdings, Inc.*, 2017 WL 3432366, at *3 (Bankr. D.

Del. Aug. 10, 2017).  Judge Sontchi noted that "[f]utility exists where the

complaint, as amended, 'would fail to state a claim upon which relief could be

granted'" and noted that the Trustee "provided no facts or allegations suggesting

that amendment of the Complaint would cause the Court to reach different results

with respect to the dismissed claims."  *Id.* at *3 (*quoting In re Burlington Coat

Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).  This appeal followed.

The appeal is fully briefed.  (D.I. 10, 14, 15, 16, 17).  On November 23,

2020, the Court held oral argument.  (D.I. 23).

## III.   JURISDICTION AND STANDARD OF REVIEW

The appeal seeks reversal of the Decision and Order granting in part

Appellees' Motions to Dismiss and remand of the matter to the Bankruptcy Court

to adjudicate the adversary proceeding on the merits of the remaining claims.  The

Order was not final on issuance because at least one claim remained against all

parties in the adversary proceeding, including multiple claims against the

Appellees.  The Order became final on April 3, 2019, when the Bankruptcy Court

entered the Order Approving Stipulation of Partial Dismissal (Adv. D.I. 242)

("Dismissal Order"), which dismissed with prejudice all remaining claims against all remaining defendants except for the claims subject to this appeal. Accordingly, the Order is final, and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158.

This Court reviews a Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof. *Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 145 F.3d 124, 130 (3d Cir. 1998).

On appeal, Trustee raises three issues: (i) whether the Bankruptcy Court properly dismissed the breach of fiduciary duty claims against the Clairvest Appellees (Counts I and II); (ii) whether the Bankruptcy Court properly dismissed the breach of fiduciary duty claims against Rocco and Burdi (Count III); and (iii) whether the Bankruptcy Court properly dismissed Counts I, II, and III with prejudice. The Bankruptcy Court's dismissal of the breach of fiduciary duty claims is subject to *de novo* review. *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (exercising plenary or *de novo* review of an order granting a motion to dismiss for failure to state a claim). The Bankruptcy Court's dismissal of Trustee's claims with prejudice and denial of the Trustee's opportunity to seek amendment is reviewed for abuse of discretion. *Lorenz v. CSX*

*Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993) (reviewing denial of motion for leave to amend and applying abuse of discretion standard).

The Bankruptcy Court dismissed with prejudice Counts I, II, and III of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to the adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012, "for failure to state a claim upon which relief can be granted." *LMI Legacy,* 2017 WL 1508606 at *9. Pursuant to Rule 12(b)(6), "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

A complaint can survive a motion to dismiss "only if, taking all well-pleaded factual allegations as true, it contains enough facts to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n. 27 (3d Cir. 2010).

This plausibility standard requires more than a mere possibility that a defendant is liable to the plaintiff. *Iqbal*, 556 U.S. at 678. When a complaint

pleads facts that are merely "consistent with a defendant's liability," it "stops short

of the line between possibility and plausibility of entitlement to relief." *Twombly*,

550 U.S. at 557.  The facts alleged must nudge the plaintiff's claims "across the

line from conceivable to plausible." *Id*. at 570.  While on a motion to dismiss, all

well-pleaded facts are accepted as true, the trial court need not accept as true

conclusory statements, statements of law, or unwarranted inferences cast as factual

allegations. *Twombly*, 550 U.S. at 555-57.

## IV.   ANALYSIS

### A.   Breach of Fiduciary Duty Under New York Law

To assert a breach of fiduciary duty under New York law, a plaintiff must

show (1) a breach by a fiduciary of a duty owed to the plaintiff, (2) defendant's

knowing participation, and (3) damages. *SCS Commc'ns, Inc. v. Herrick Co.*, 360

F.3d 329, 342 (2d Cir. 2004).  There are two components to a director's fiduciary

duties to a corporation: a duty of care, and a duty of loyalty and good faith. *See*

*Friedman v. Wahrsager*, 848 F.Supp.2d 278, 288 (E.D.N.Y. 2012); *Norlin Corp. v.*

*Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984).  Absent a breach of duty, the

business judgment rule "bars judicial inquiry into actions of corporate directors

taken in good faith and in the exercise of honest judgment in the lawful and

legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 47 N.Y.2d

619, 620 (N.Y. 1979).

### 1.   Duty of Care

As the Bankruptcy Court observed, under New York law, "[a] director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." *LMI Legacy*, 2017 WL 1508606, at *6 (quoting N.Y. BUS. CORP. LAW § 717(a)).   The duty of care obligates directors to act on a reasonably informed basis. *Higgins v. N.Y. Stock Exchange, Inc.*, 806 N.Y.S.2d 339, 362 (N.Y. Sup. Ct. 2005); *Roselink Investors v. Shenkman*, 386 F. Supp. 2d 209, 220 (S.D.N.Y. 2004) ("[D]irectors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.") (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).   In order to establish a breach of the duty of care, Plaintiff need only "establish that the offending parties' actions were a 'substantial factor' in causing an identifiable loss." *RSL Commc'ns PLC ex rel. Jervis v. Bildirici*, 2006 WL 2689869, at *5 (S.D.N.Y. Sept. 14, 2006) (internal citations omitted).

However, as the Bankruptcy Court noted, the presence of an exculpatory clause in a company's certificate of incorporation is relevant to an inquiry of liability for breach of the duty of care.   Section 402(b) of the New York Business Corporation Law provides that, with  certain exceptions, a "certificate of

incorporation may set forth a provision eliminating or limiting the personal liability of directors to the corporation or its shareholders for damages for any breach of duty in such capacity ..." N.Y. BUS. CORP. LAW § 402(b). Generally, section 402(b) shields a corporation's directors from liability for negligent acts or omissions occurring in their capacity as directors. *In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 473 (Bankr. S.D.N.Y. 2016). It also identifies five types of conduct that cannot be exculpated: (1) bad faith, (2) intentional misconduct, (3) knowing violation of law, (4) financial profit or other advantage to which the director was not legally entitled, and (5) violations of section 719 of the Business Corporation Law.[6] *Id.* As the Bankruptcy Court noted, "Absent bad faith or financial profit, the existence of such an exculpation clause can form the basis for dismissal of a claim alleging breach of duty of care." *LMI Legacy*, 2017 WL 1508606, at *6 (citing *In re IT Grp. Inc.,* 2005 WL 3050611, at *11 (D. Del. Nov. 15, 2005)). The failure to act in good faith may be shown "where a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation ... acts with the intent to violate applicable positive law, or ... intentionally fails to act in

---

[6] Section 719 imposes liability against directors who vote or concur in the vote (1) to declare a dividend or other distribution in violation of Business Corporation Law § 510; (2) to purchase or redeem the corporation's shares in violation of § 513; (3) to distribute assets of the corporation to shareholders after dissolution without paying or providing for known creditors and creditors; and (4) making a loan to a director contrary to § 714. N.Y. BUS. CORP. LAW § 719(a). This section is inapplicable to this appeal.

the face of a known duty to act, demonstrating conscious disregard for his duties."
*Ampal-Am. Israel Corp.*, 543 B.R. at 475 (internal citations omitted).

### 2. Duty of Loyalty

The fiduciary duty of loyalty dictates that an officer or director "may not
assume and engage in the promotion of personal interests which are incompatible
with the superior interests of their corporation." *Foley v. D'Agostino*, 21 A.D.2d
60, 66 (1964). As the Bankruptcy Court observed, self-interestedness is a hallmark
of the breach of one's duty of loyalty. *LMI Legacy*, 2017 WL 1508606, at *7.
"Director interest may either be self-interest in the transaction at issue (*see Barr v.
Wackman*, 329 N.E.2d 180, 184 (1975) (receipt of 'personal benefits')), or a loss of
independence because a director with no direct interest in a transaction is
'controlled' by a self-interested director." *Marx v. Akers*, 666 N.E.2d 1034, 1041
(1966). "The test for self-interestedness is not whether a director or someone who
controls him has engaged in or is liable for some sort of misconduct, but whether
he will 'receive a direct financial benefit from the transaction which is different
from the benefit to shareholders generally.'" *Stein v. Immelt*, 472 F. App'x 64, 66
(2d Cir. 2012) (quoting *Marx*, 666 N.E.2d at 1042).

The Bankruptcy Court, commenting on the distinction between the duties of
care and loyalty, stated that "[c]ourts have, at times, found the distinction between
an exculpable lack of due care and a non-exculpable lack of loyalty and good faith

difficult to discern." *LMI Legacy*, 2017 WL 1508606, at *8. The Bankruptcy

Court noted that, "[i]n turning to Delaware law, New York courts have found lack

of due care involves fiduciary action taken solely by reason of gross negligence

and without any malevolent intent." *Id.* (quoting *Ampal-Am. Israel Corp.*, 543

B.R. at 475) (internal citations and quotations omitted)). As explained in *Ampal-*

*Am. Israel Corp.*:

> Gross negligence includes "a failure to inform one's self of available
> material facts," and without more, cannot constitute bad faith. Instead, bad
> faith involves either subjective bad faith where the fiduciary is motivated by
> an actual intent to do harm, or a conscious disregard of one's fiduciary
> duties involving "misconduct that is more culpable than simple inattention
> or failure to be informed of all facts material to the decision."

*Ampal-Am. Israel Corp.*, 543 B.R. at 475 (quoting *In re Walt Disney Co.*

*Derivative Litig.*, 906 A.2d 27, 64-66 (Del. 2006)) (internal citations omitted).

## B.   Breach of Fiduciary Duty Claims Against the Board (Count I) and the Clairvest Appellees (Count II)

Count I of the Complaint alleges that as directors of LMI, the Board owed

LMI the fiduciary duties of care and loyalty. "The Board, acting both individually

and collectively, consciously disregarded its duties" by "neglecting to monitor the

Company's sale process" and "abandoning its crucial decision-making power and

authority over to Clairvest and the Clairvest Board Members," giving them

"unfettered control," which "was not in the best interests of the Company" because

they knew "Clairvest and the Clairvest Board Members would attempt to use the

sales process to try and recover Clairvest's worsening investment at the expense of the company and its other stockholders." (Complaint ¶¶ 163-164). Count I of the Complaint further alleges that "the Board failed to act with the amount of care required by ordinary persons in their position by failing to adequately and deliberately inform themselves about the facts surrounding LMI's sale process," failing to seek "any other independent professional opinion or advice with respect to the sale process or the fairness and/or adequacy of presented transactions," and failing to "engage with the Special Committee." (*Id.* ¶ 165-166). Finally, "once the Company attempted to integrate itself with Medstar and Rite Care, the Board failed to consider or correct various apparent violations of healthcare laws, including Medicare compliance regulations" and "wasted corporate assets by allowing the Company to proceed with the LMR Merger before proper lender and shareholder approval and by recklessly transferring hundreds of thousands of dollars without receiving any value in return." (*Id.* ¶ 167). As such, the Complaint asserts, the Board is not entitled to the protection of the business judgment rule. (*Id.* ¶ 168).

Count II of the Complaint alleges that, as directors of LMI, the Clairvest Board Members owed LMI the fiduciary duties of care and loyalty; as the controlling majority shareholder of LMI, Clairvest owed LMI's other shareholders the fiduciary duty of loyalty; and at all relevant times, Clairvest had control over

the Board by virtue of the fact that it was the majority shareholder of the Company

and controlled a majority of the seats on the Board based on the fact that, at any

given time, the Clairvest designees to the Board were all either Clairvest

employees or acting at the discretion of Clairvest.[7]  (Complaint ¶¶ 173-175).  The

Complaint further alleges that, in November 2011, Clairvest was aware that its

investment in LMI was threatened by the results of the Competitive Bidding

process; exerted its control over the Board, usurping its power and authority over

the sale process in order to control the form and substance of negotiations, and

seeking out transactions on behalf of Clairvest that contemplated the full payment

of Clairvest's preferred shares without consideration of the value achieved for

other shareholders or regard for whether other transactions were in the best interest

of the Company.  (*Id.* ¶¶ 176-177).  The Complaint also alleges that Clairvest acted

in bad faith in seeking out transactions that would maximize Clairvest's return on

investment and failing to seek out strategic transactions in the best interest of LMI

and all of LMI's shareholders.  (*Id.* ¶ 179).  The Complaint contains the same

allegations against Clairvest Appellees regarding the LMR Merger as asserted

Count I; namely, that Clairvest and Clairvest Board Members failed to consider or

---

[7] The parties dispute whether the Complaint contains sufficient allegations to infer
that Clairvest controlled the LMI Board of Directors.  (*See* D.I. 14 at 23-26; D.I. 17
at 4-9).  The Decision does not address this issue, and based on the conclusions
herein, it is not necessary for the Court to reach this question to resolve this appeal.

correct various apparent violations of healthcare laws, including Medicare compliance regulations, and wasted corporate assets by causing the Company to proceed with the LMR Merger before proper lender and shareholder approval had been obtained and by transferring funds without receiving any value in return.  (*Id.* ¶ 182).  As such, the Complaint alleges, "Clairvest and the Clairvest Board Members are not entitled to the protection of the business judgment rule for the breach of their duties."  (*Id.* ¶ 183).

On appeal, the Trustee attempts to show that the allegations of the Complaint asserted non-exculpated conduct by the Clairvest Appellees during three separate time-frames: the sale process in late 2011 and early 2012 (which the Trustee refers to as the "First Sale Process"); the second sale process in 2012 and 2013 (which Trustee refers to as the "Second Sale Attempt"); and in 2013, while LMI was in the process of completing the LMR Merger.

### 1.    First Sale Process (Complaint ¶¶ 68-91)

With respect to the Board as a whole, the majority of the Complaint's allegations concern omissions and a disregard for their duties to inquire and be informed about the effects of the Competitive Bidding failure, the sale process, and the unsuccessful merger process.  (*See, e.g.,* Complaint ¶¶ 71-72 (Board made no effort to understand or approve proposed process regarding LMI sale); *id.* ¶ 75 (Board did not deliberate regarding formation of Special Committee); *id.* ¶ 77

25

(Board failed to monitor Special Committee); *id.* ¶ 80 (the 2011-2012 sale process ran and concluded without Board oversight); *id.* ¶¶ 81, 88, 90 (Board knew Competitive Bidding was a significant issues for LMI but did little to prepare for a transition); *id.* ¶¶ 84-85 (Board did not inquire of scope or progress of search for acquisition candidates which could expand LMI's geographic reach or other updates on sale progress); *id.* ¶ 96 (Board did not first meet for month following LMI's Competitive Bidding failure to consider options)).  As the Decision notes, bad faith involves either subjective bad faith where the fiduciary is motivated by an actual intent to do harm, or a conscious disregard of one's fiduciary duties involving misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision.  *LMI Legacy*, 2017 WL 1508606, at *8.  The Complaint's allegations concern an inattention or failure to be informed of all facts material to the sale and merger.  Failure to inform one's self of available material facts, and without more, cannot constitute bad faith.  *See Ampal-Am.*, 543 B.R. at 475.

With respect to the Clairvest Appellees, as the Bankruptcy Court correctly noted, in order to plead around section 402(b), the Complaint must contain factual, nonconclusory allegations that implicate one of these exceptions:  (1) bad faith, (2) intentional misconduct, (3) knowing violation of law, (4) financial profit or other

advantage to which the director was not legally entitled, and (5) violations of section 719 of the Business Corporation Law.

The parties agree that the section 719 exception does not apply. (*See* D.I. 14 at 22 n.10; *see generally*, D.I. 10, 17). The Complaint does not state sufficient factual matter to support an inference that Appellees obtained a financial profit or other advantage as a result of their alleged acts or omissions. The Trustee's claims alleging breaches of fiduciary duties against Clairvest Appellees are predicated on the argument that Clairvest dominated the LMI Board, ultimately usurping control of the sale process to LMI's detriment. As set forth below, the Complaint's allegations of misconduct against the Clairvest Appellees are insufficient to allow the Court to draw a reasonable inference of an intent to do harm to LMI or intentional misconduct.

The Complaint alleges that Clairvest was obligated to retain RBC because of the parties' pre-existing relationship; that neither Clairvest nor RBC disclosed their prior relationship to the Board; that no other candidates were considered for the engagement; and that Clairvest announced the retention even before the Board ever met to consider it. (Complaint ¶¶ 70-72). The Complaint further alleges that Clairvest controlled the Company's relationship with RBC, used RBC to set a strike price, and received negotiated bids which it failed to disclose to LMI. (*Id.* ¶¶ 79, 86-87). According to the Complaint, the Clairvest Appellees usurped control

27

of the Board in this manner for the improper purpose of their "single-minded pursuit of liquidating their preferred shares." (*Id.* ¶ 14).

The Trustee concedes that Clairvest had the right to trigger the sale process in November 2011 pursuant to the Shareholders Agreement. (D.I. 10 at 36). The Complaint concedes that, at the November 4, 2011 LMI Board meeting, the Board created a three-person subcommittee of Sturdee, Landauer, and Rocco, "to oversee the sale process." (Complaint ¶ 71). There is nothing to support the allegation that Clairvest was required to retain RBC. Indeed, the email referenced in the Complaint, in which Sturdee notified another bank that it had been unsuccessful in securing the engagement, stated that "we are obligated to give our institutional LPs a shot at mandates like this where they have the subject matter expertise and experience, which they do in this case." (Adv. D.I. 141-1 at 2). This indicates that other banks were interviewed and that RBC was selected for its expertise and experience. As the Bankruptcy Court noted, "[t]he Trustee does not allege that, notwithstanding Clairvest's pre-existing relationship with RBC, LMI should not have hired RBC or that another bank would have enabled LMI to reach a different result." *LMI Legacy,* 2017 WL 1508606, at *8.

Additionally, the proffered evidence reflects that the RBC engagement letter was circulated to LMI's corporate counsel and secretary to the Board four days before the November 4, 2011 Board meeting. (*Id.*) Under the Shareholders'

Agreement, Clairvest had the right to select LMI's investment advisor, and while it was subject to Landauer's consent, the Complaint alleges that Landauer provided that consent at the November 4, 2011 Board meeting. (Complaint ¶ 72)

The Trustee asserts that "upon information and belief" Clairvest Appellees received negotiated bids for LMI for $70 million and failed to disclose those bids to the Board. (Complaint ¶ 87). An offer close to this amount would have been significantly higher than the $22 million received in LMI's eventual post-petition sale. (*See* D.I. 10 at 40). The Clairvest Appellees argue that Trustee's conclusory statements regarding alleged undisclosed bids is not sufficient, as the Complaint does not identify anything about the alleged offers, sources, or terms, and instead pleads their existence in the generic plural. Nor do the allegations state how those offers prefer Clairvest's interests over the interests of other shareholders, the Clairvest Appellees argue. Conversely, the Trustee argues that this is a factual question that can only be answered in discovery because the details of the offers are facts to which only Clairvest Appellees – and their insider investment banker – have access. (D.I. 17 at 10). The Trustee further contends that, while it is an issue of fact more appropriate for summary judgment, the Complaint provided sufficient support for allegations that negotiated bids were received but not disclosed. The Trustee attaches to his Reply several communications, all apparently concerning the same potential suitor: an April 27, 2012 email indicating that "RBC explained

to [bidder] that management likes them but that Clairvest is not willing to transact at the $70M Valuation" and concluding "It's nothing yet, but it's a step in the right direction." (D.I. 17, Exh. B-1). Trustee also attaches a May 3, 2012 email between RBC and Clairvest attaching a letter of intent from the bidder at an $80 million purchase price. (*Id.* at Exh. B-2); *but see* June 2012 company memo, addressing potential sale of the company to the same bidder, which states that the bidder "… came back with 'final' bid of $70M, which they subsequently raised to $80M, ***then unexpectedly withdrew, citing new views regarding regulatory uncertainty***." (*Id.*, Exh. A at 6 (emphasis added)).

The Court agrees that the Complaint's linchpin allegation – the supposed offers received by Clairvest during this period that were not disclosed to the Board or acted upon – lacks adequate support to nudge the Trustee's claims of misconduct "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The allegations and documents reflect negotiations with one bidder that ultimately failed, and the remaining portions of the Complaint contain merely conclusory statements regarding Clairvest's improper motive and purpose. The Complaint alleges no facts other than that the First Sale Process was properly initiated by Clairvest and ended without a successful sale. Although the Complaint also puts forth conclusory statements that Clairvest was required by its own investors to realize a "specific exit" from Clairvest's investment in LMI, the

Trustee concedes that "Clairvest was seeking to maximize a sale price, and if achieved, all shareholders may have benefitted equally." (D.I. 10 at 37). As the Bankruptcy Court noted, the Complaint also failed to allege that a different investment banker "would have enabled LMI to reach a different result." *LMI Legacy*, 2017 WL 1508606, at *8. In sum, nothing is alleged in the Complaint suggesting that, during the first sale process, the Clairvest Appellees were engaged in bad faith or intentional misconduct, knowingly violated the law, or obtained a financial profit or other advantage to which they were not legally entitled.

## 2. Second Sale Attempt (Complaint ¶¶ 92-116)

With respect to the second sale process, the Complaint alleges that during the period after January 20, 2013, following LMI's loss of the Competitive Bidding process, the Clairvest Appellees secretly sought a sale transaction that would prefer Clairvest's preferred stock interests over the interests of LMI's common shareholders. The Trustee argues that "Clairvest focused on maximizing the value of preferred shares and pursuing 'creative ways to get Clairvest whole' to the exclusion of common shareholders." (D.I. 10 at 41 (citing ¶ 114 of the Complaint and quoting email from Quadrant to Rotman and Champsi). Paragraph 114 of the Complaint, on which the Trustee relies, alleges only that the Clairvest Directors were discussing a possible sale transaction with Quadrant, and does not allege that the Clairvest Directors actually proposed excluding LMI's common

shareholders in connection with the Quadrant transaction or that Quadrant made an actual offer which excluded common shareholders. The Complaint also quotes communications from Champsi indicating that he was "weary of putting more [preferred shares] above us in the structure." (Complaint ¶ 105). Again, there is no allegation that such an offer favoring preferred shares was ever made.

The Trustee further argues that the Clairvest Appellees advanced their own interests as preferred stockholders in negotiations with Allcare but provides no support for this conclusory statement. (D.I. 10 at 42). The Letter of Intent with Allcare provided that Allcare would acquire LMI by paying LMI's existing shareholders $33 million in cash and assuming LMI's debt. (Complaint ¶ 106). In the Complaint, Trustee conceded that "Allcare's valuation of LMI was higher than any other offer." (*Id.* ¶ 118). The Trustee refers to the Allcare transaction as "viable." (D.I. 10 at 53). There is no allegation in the Complaint that the Allcare transaction would have favored LMI's preferred stockholders. The Allcare transaction was approved by an 8-1 vote of the Board and fell apart not because of any action or inaction by the Clairvest Appellees, but because the U.S. Attorney General's office initiated the CID regarding LMI's alleged violations of the Federal False Claims Act. (Complaint ¶¶ 125-126).

While the Complaint includes many references to "bad faith" and "waste," these conclusory assertions alone, as the Bankruptcy Court found, are insufficient

to plausibly plead bad faith under New York law. *See, e.g., Stern v. Gen. Elec. Co.*, 837 F. Supp. 72, 76 (S.D.N.Y. 1993), *aff'd*, 23 F.3d 746 (2d Cir. 1994). As noted, bad faith requires "either subjective bad faith where the fiduciary is motivated by an actual intent to do harm, or a conscious disregard of one's fiduciary duties involving 'misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision.'" *Ampal-American Israel Corp.*, 543 B.R. at 475 (internal citations omitted). Nothing is alleged in the Complaint that would support an inference that during the Second Sale Attempt, the Clairvest Appellees (1) were engaged in bad faith or intentional misconduct, (2) knowingly violated law, or (3) obtained financial profit or other advantage to which they were not legally entitled, thus no violation of the duty of care has been stated that would not be exculpated by LMI's certificate of incorporation.

The Decision notes that while the "complaint paints a broad picture of Clairvest and the Board engaging in activity that was questionable, to say the least," "the instant Claims are duty of care claims, and not duty of loyalty claims." *LMI Legacy*, 2017 WL 1508606, at *9. Self-interestedness is a hallmark of the breach of one's duty of loyalty, and the test for self-interestedness is whether he will "receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Stein*, 472 F. App'x at 66. Thus, to plead

around the Exculpation Clause, the Trustee was required to allege that a transaction actually occurred.  With no transaction having been consummated during the First Sale Process or Second Sale Attempt, the Complaint has not asserted a non-exculpated claim based on a breach of the duty of loyalty either.

### 3.    Failed LMR Merger (Complaint ¶¶ 117-160)

Trustee argues that Counts I and II of the Complaint plead around the Exculpatory Clause based on allegations that the Clairvest Appellees violated various healthcare laws in connection with the failed LMR Merger.  Specifically, Trustee argues that the Complaint properly plead (i) knowing violations of healthcare laws on the part of Clairvest (Complaint ¶¶ 31-33); and (ii) intentional misconduct in the form of fraudulent payments (*id.* ¶¶ 34-35).

The Complaint alleges that Champsi and Pirzada, Medstar's CEO, "told Rocco that they intended to operate the merged companies in violation of the law" until certain compliance issues were resolved.  (*Id.* ¶ 135).  However, the Complaint later alleges that "Clairvest proposed certain work-around solutions . . . to comply with Medicare regulations." (*Id.* ¶ 148).  The Trustee argues that, despite briefing and argument on the specific issue, the Decision did not consider the Trustee's allegations that the Clairvest Appellees caused and allowed LMI to operate in knowing violation of the law.  (D.I. 10 at 48).  The Court finds that, while not addressed specifically in the Decision, the factual allegations contained

34

in the Complaint do not support a reasonable inference of intentional misconduct that would fall outside of the Exculpatory Clause. The mere fact that, as the Complaint alleges, LMI's compliance officer did not agree with the proposed work around solutions is insuffcient for the Court to reasonably infer that the Clairvest Appellees were knowingly violating the law. Rather, the allegations in the Complaint depict Clairvest Appellees taking actions to comply with the law.

Conclusory allegations of illegality have been rejected by courts on motions to dismiss as insufficient to allege a breach of fiduciary duty. *See, e.g., In re Hecla Min. Co. Derivative S'holder Litig.*, 2014 WL 689036, at *9 (D. Idaho Feb. 20, 2014) (with respect to plaintiff's allegation that defendants actively caused or permitted Hecla to violate mine safety law, "Plaintiffs provide no allegations of fact beyond these conclusory assertions regarding either the information made available to the board or what the board did in response to such information.... Simply put, more is needed."); *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) ("[T]he Complaint alleges many violations of federal securities and tax laws but does not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal."); *Rattner v. Bidzos*, 2003 WL 22284323, *6 (Del. Ch. Sept. 30, 2003) (same).

With respect to the circumstances surrounding the transfer of funds from LMI to Rite Care and Medstar as part of the proposed merger — the corporate

waste alleged in the Complaint — it is clear that, although the merger process had commenced, it had not closed before LMI lost its rights to take Medicare orders due to losing the Competitive Bidding process. (Complaint ¶ 145). While the Complaint paints a picture of gratuitous payments from LMI to Rite Care and Medstar for no apparent purpose (*id.* ¶¶ 145-46), the Complaint also alleges in these paragraphs that "Rite Care faced significant problems in keeping up with the increased volume [of Medicare orders]." (*Id.* ¶ 145). The Complaint does not allege that such transfers were made in bad faith or with the intent to defraud. Rather, the Complaint alleges that the payments were made in connection with the LMR Merger, at a time when all involved expected that the merger would be completed, and not for some illicit purpose that would fall outside of the Exculpatory Clause. Again, the facts as alleged are simply not sufficient to nudge the Trustee's claims of intentional misconduct or knowing violation of the law "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Similarly, the Trustee asserts that Clairvest participated in intentional misconduct during the LMR Merger based on the Complaint's allegations of a transfer of $104,922.16 from LMI to Clairvest GP Manageco Inc. for unspecified services. (Complaint ¶¶ 282-283). These allegations are insufficient to allow the Court to draw a reasonable inference of an intent to do harm to LMI or intentional misconduct that would satisfy Trustee's burden in pleading around the Exculpatory

36

Clause.  Reference to conclusory allegations of "intentional misconduct" are

insufficient under New York law.  *See, e.g., In re Ampal-Am.*, 543 B.R. at 474;

*Teachers' Ret. Sys.*, 244 A.D.2d at 232.

Quoting *Ampal-American Israel Corp.*, the Bankruptcy Court correctly

noted that even "[a]ssuming [the Complaint] states a claim for breach of duty, it

does not allege dishonesty or an improper purpose, and the mere invocation of 'bad

faith' does not transform the claim into something it's not."  *LMI Legacy*, 2017 WL

1508606, at *8.  Given that neither Clairvest nor the Clairvest Directors breached

any duty owed to LMI, the Court agrees that they are afforded the benefit of the

business judgment rule and concludes that Counts I and II were properly

dismissed.

### C.    Breach of Fiduciary Duty Claims Against Rocco and Burdi (Count III)

Count III of the Complaint alleges that, as officers of LMI, Rocco and Burdi

owed LMI the fiduciary duties of care and loyalty.  The Complaint alleges that

despite these duties, Rocco and Burdi, acting individually and collectively, pursued

their own interests, abdicated their duties as managers, authorized bonus payments

to themselves, and favored employees prior to their respective resignations.

(Complaint ¶¶ 190-191).  The Complaint alleges that Rocco and Burdi favored a

transaction with Allcare because they would continue to manage the new entity

and see a full return on their financial investment in LMI; shared a dislike for

Pirzada as the co-CEO that would inevitably follow the LMR Merger; consciously disregarded their duties by interfering with the LMR Merger and any transaction other than their preferred Allcare transaction; abdicated their management positions when the Company was on the verge of financial ruin; and authorized bonus payments immediately prior to their respective resignations. (*Id.* ¶¶ 192-193). The Complaint alleges that Rocco and Burdi's actions were entirely adverse to the LMI's best interests, directly led to the LMI's bankruptcy filing, and, as such, the Complaint alleges, Rocco and Burdi are not entitled to the protection of the business judgment rule for breach of their duties. (*Id.* ¶¶ 195-196).

The Decision dismissed Count III for breach of fiduciary against Rocco and Burdi, citing "the aforementioned reasons" relating to the dismissal of Counts I and II against Clairvest Appellees. *LMI Legacy*, 2017 WL 1508606, at *9. The Trustee argues that the Complaint contains discrete and unique allegations pertaining only to Rocco's and Burdi's bad faith and disloyal conduct that are not implicated in Counts I and II. (D.I. 10 at 52).

The Trustee argues that the Complaint sufficiently pleads that Rocco and Burdi breached their fiduciary duties by (1) pursuing a deal with Allcare to advance their personal interests; (2) ignoring warnings and failing to object to Clairvest's plan to operate LMI in violation of healthcare laws during the LMR integration; (3) sabotaging the LMR merger; (4) abandoning LMI at a critical time

to work for a competitor; and (5) engaging in self-dealing relating to bonuses and other payments before resigning. (D.I. 10 at 26, 46).

More specifically, the Trustee argues that "Rocco's and Burdi's interest were incompatible with LMI's because they were concerned with only maximizing personal compensation, interests, and keeping their management positions" and that the factual allegations in the Complaint support a reasonable inference that Rocco and Burdi pursued an Allcare transaction at the expense of the superior interest of LMI, in violation of New York law. (D.I. 10 at 48-49 (citing *Foley*, 21 A.D.2d at 66)). According to the Trustee, the Complaint sufficiently alleges that, during the Second Sale Attempt, Rocco sent multiple emails to Champsi asking what Rocco and Burdi would personally recoup under various deals, indicating that they were interested only in their personal profit. (Complaint ¶ 102). The Complaint further alleges that Rocco expressed hostility for any deal involving Quadrant or Pirzada, demonstrating his personal animus for Pirzada, and that he had no intention of giving a deal with those parties a fair chance, regardless of whether such a deal was in LMI's best interests. The Complaint alleges that Burdi similarly revealed his hostility to Pirzada in an email underscored with profanity. (*Id.* ¶¶ 110, 150). The Complaint alleges that Rocco and Burdi singularly sought an Allcare transaction based on their monetary interest in job security as well as a prideful interests in not sharing responsibilities with Pirzada. (*Id.* ¶¶ 129, 136-

137).  The Complaint cites an internal Clairvest memo stating "it is evident … that [Appellees] were never going to cooperate with the merger and aggressively sought to sabotage it."  (*Id.* ¶ 159).  The Complaint also cites communications where Rocco foreshadowed "that a number of LMI executives have other job opportunities" and "will walk out the door if [Pirzada] takes over."  (*Id.* ¶ 36).  Moreover, the exodus is precisely what the Complaint alleges did occur:  Rocco and Burdi resigned, taking with them "a mass defection of [approximately 70] employees … including every member of the senior management team," despite knowing these actions would destroy LMI.  (*Id.* ¶ 159).

While the Allcare deal would have allowed Rocco and Burdi to keep their positions, there are no factual allegations that that the Allcare deal provided less value to LMI than any other offer.  The only personal interests alleged to have been pursued by Rocco and Burdi are continued employment on with Allcare and recouping their financial interests in LMI.  (Complaint ¶ 101).  The Complaint contains no allegations that Rocco and Burdi were "on both sides" of the Allcare deal or benefitted from the LMR integration.  Moreover, the deal never came to fruition, so Rocco and Burdi could not have received any benefit not shared by all of LMI's shareholders.  When the Allcare deal failed to close, the Board voted to approve the LMR Merger, despite Rocco vehemently opposing the proposed leadership structure.  Rocco opposed the integration of the companies prior to

finalization of the LMR merger, including the work-arounds, and the Complaint alleges his objections were ignored.  (Complaint ¶¶ 145-149).  Rocco and Burdi were not the only employees to exit LMI during the conceded premature integration of LMI with Medstar and Rite Care; the exodus included 75 employees and senior management, including CFO John Accumanno and Maureen O'Leary, and this leadership exodus led to TD Bank's withholding of consent to the LMR Merger.  The allegations outlined above are not sufficient to show that Rocco and Burdi were "motivated by an actual intent to do harm" or a "conscious disregard of one's fiduciary duties" as is required to plead bad faith.  Like Counts I and II, the allegations against Rocco and Burdi concern a lack of due care, which alone do not rise to the level of non-exculpable breach of duty of loyalty or good faith.

However, the Court agrees with the Trustee that the Complaint contained additional discrete and unique allegations against Rocco and Burdi that should have been addressed in the Decision.  Just before Rocco and Burdi left, the Complaint alleges that they drained LMI of important operating funds in the amount of $250,000.  The Complaint alleges self-dealing in transactions including bonus payments authorized by Rocco and Burdi and benefits payments based on accrued vacation which were permitted only as a result changes in LMI's vacation policy instituted by Rocco and Burdi.  (*Id.* ¶¶ 151-152).  Notably, it appears that

41

Rocco and Burdi never moved to dismiss the breach of fiduciary duty claims related to bonus payments and benefit payments they received.

The Bankruptcy Court dismissed the claims against Rocco and Burdi *sua sponte* without analysis. Had this been the end of the matter, the Court would not be able to affirm Count III's dismissal. However, on reconsideration, the Bankruptcy Court provided context for its ruling. There, the Trustee argued that the Bankruptcy Court should reconsider its dismissal of Count III for two reasons: (1) on the ground that Rocco and Burdi had not disputed that the Trustee's allegations, which concerned payments they and other employees who left LMI had accepted, stated a viable claim for breach of fiduciary duty; and (2) the Bankruptcy Court overlooked discrete and unique factual allegations pertaining only to Rocco and Burdi's alleged misconduct – specifically, allegations that Rocco and Burdi violated their duty of loyalty by in promoting their own personal interests which were incompatible with those of LMI. In the Reconsideration Decision, the Bankruptcy Court explained that the Complaint failed "to allege sufficient facts to support a finding that Rocco and Burdi pursued interests that were incompatible with LMI's interests when they resigned, accepted bonus payments, and allegedly attempted to solicit LMI employees." *LMI Legacy*, 2017 WL 3432366, at *2. The Bankruptcy Court also cited evidence presented relating to a release of Rocco and Burdi entered in resolution of a related employment

lawsuit, which, on its face, barred the Trustee from asserting claims against Rocco and Burdi relating to improper solicitation of LMI employees. *Id.* at *2, n. 10. (*See* D.I. 193, Exh. A & B ("The settlement agreement released claims regarding the non-solicitation provisions contained in Rocco and Burdi's employment agreements. The non-solicitation provisions prohibited Rocco and Burdi from soliciting former employees. However, the release explicitly provides that Rocco and Burdi are released from any and all manner of actions, causes of actions, losses, claims relating to the solicitation of former employees.").

The Court agrees that reading the Complaint in a light most favorable to the Trustee, it contains insufficient allegations for the Court to reasonably infer that Rocco and Burdi violated the duty of care by conduct that does not fall within the Exculpation Clause. Trustee contends although Rocco and Burdi were "free to resign when they wanted," this does not negate the fact that by "running away" at a critical time Rocco and Burdi breached their fiduciary duties. (D.I. 10 at 51). The mere fact that LMI was in financial distress cannot elevate Rocco and Burdi's resignations to breaches of a duty of care, much less a breach of the non-exculpated duties of loyalty and good faith. With respect to the other duty of loyalty claims, other than conclusory allegations, the Trustee has failed to show that the acceptance of bonuses and other payments was in fact incompatible with LMI's interests. "[W]here the well-pleaded facts do not permit the court to infer

43

more than the mere possibility of misconduct, the complaint has alleged – but it

has not 'show[n]' – that the pleader is entitled to relief." *Ashcroft*, 556 U.S. at 679

(citation omitted).  Dismissal of this claim may be affirmed because this issue was

raised in the Bankruptcy Court and affirmance is warranted on any basis that finds

support in the record.  *Geness v. Cox*, 902 F.3d 344, 356 (3d Cir. 2018); *Parks v.*

*Twp. of Portage*, 385 Fed. Appx. 118, *6 (3d Cir. 2010).

### D.    Dismissal With Prejudice of Counts I, II, and III

The Supreme Court has instructed:

> [t]he grant or denial of an opportunity to amend is within the
> discretion of the [] court, but outright refusal to grant leave without
> any justifying reason … is not an exercise of discretion; it is merely
> abuse of that discretion and inconsistent with the spirit of the Federal
> Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added).  In the Third Circuit,

"[i]t does not matter whether or not a plaintiff seeks leave to amend.  We have

instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court

must permit a curative amendment, unless an amendment would be inequitable or

futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

On appeal, the Trustee argues that, despite recognizing Defendants' conduct

and activities as "questionable, to say the least," the Bankruptcy Court included no

explanation for the basis of its decision to dismiss the fiduciary duty claims with

prejudice and deny leave to amend, which amounts to an abuse of discretion.  (D.I.

10 at 55-56).  And, according to the Trustee, "[t]he sheer number of emails, memoranda, communications, Board meetings, and other factual matters referenced and discussed in the context of a Rule 12(b)(6) motion indicates the availability of additional factual allegations to support the Trustee's underlying claims."  (*Id.* at 24-25).

The Decision provided no explanation as to the basis for the Bankruptcy Court's dismissal of the fiduciary duty claims with prejudice and such dismissal would be an abuse of discretion were it not for the subsequent reconsideration proceedings.  The lengthy Reconsideration Motion set forth the reasons why the Complaint met the pleading standard (*see* Adv. D.I. 190 ¶¶ 28-54; Adv. D.I. 197 ¶¶ 13-56), and it also challenged the Decision's dismissal of claims with prejudice on the basis that the Decision did not set forth any explanation as to why amendment would be futile or inequitable (Adv. D.I. 190 at 4 & ¶¶ 55-56; Adv. D.I. 197 ¶¶ 57-60).  The Trustee requested that the Bankruptcy Court "should allow the Trustee to amend, ***or at least provide explanation for the basis of a 'with prejudice' dismissal***."  (*Id.* at 4) (emphasis added).

The Reconsideration Decision clarified the Bankruptcy Court's reasoning for denying amendment was futility, as "the Trustee provided no facts or allegations suggesting that amendment of the Complaint would cause the Court to

45

reach different results with respect to the dismissed claims." *See LMI Legacy*, 2017 WL 3432366, at *3 (quoting *Burlington*, 114 F.3d at 1434).

The Trustee argues on appeal that the Bankruptcy Court abused its discretion in denying leave to amend, and that he should be permitted to file a motion for leave to amend in order provide such additional facts, allegations, or argument for the viability of an amended complaint. (D.I. 17 at 24). Conversely, the Clairvest Appellees argue that the Bankruptcy Court properly concluded that any attempt to plead around the Exculpatory Clause would be futile in this case, and that the Trustee failed to identify new facts or arguments in the Reconsideration Motion. (D.I. 14 at 42). Similarly, Rocco and Burdi argue that the Trustee "failed to present either new law or fact to show that the Bankruptcy Court's reasoning was wrong, and it fails to explain how pleading new or additional facts will cure the legal insufficiency identified in the Decision." (D.I. 16 at 20).

Leave to amend a complaint may be denied where, among other things, leave to amend would lead to undue delay or would be futile. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Futility exists where the complaint, as amended, would fail to state a claim upon which relief could be granted and would be immediately subject to dismissal. *Burlington*, 114 F.3d at 1434. The Bankruptcy Court's denial of the Trustee's opportunity to seek amendment is reviewed for abuse of discretion. *Lorenz*, 1 F.3d at 1413. A court abuses its discretion only

46

when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment. *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (abuse of discretion exists when the "Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.")

In two thorough opinions, Judge Sontchi determined that, at best, the breach of fiduciary duty claims asserted in the Complaint were breaches of the duty of care, and that the Exculpatory Clause, as a matter of law, shielded the Clairvest Appellees from those claims. The Bankruptcy Court thus concluded that any attempt to plead around the Exculpatory Clause would be futile in this case. There is no basis to conclude that the exercise of the Bankruptcy Court's discretion in this regard was arbitrary, results in a manifestly unreasonable judgment, or results from an improper application of law to fact. If the duty of care claims are ultimately exculpated, then granting the Trustee's request to replead the claims with additional documentary and factual support will not lead to a different result. The Bankruptcy Court further found no facts or allegations suggesting that amendment of the Complaint would lead it to reach different results with respect to the dismissal of Count III claims against Rocco and Burdi. The arguments

47

presented here with respect to the duty of loyalty claims against Rocco and Burdi do not persuade the Court that amendment of the Complaint would lead to different result.

Finally, while the basis for the Bankruptcy Court's dismissal with prejudice – futility – was set forth in the Reconsideration Decision, as opposed to the original Decision dismissing the claims, I conclude that it would be a waste of the parties' time and judicial resources to remand this matter to the Bankruptcy Court only for it to repeat its determination.  In light of the extensive briefing already submitted to the Bankruptcy Court, remand to allow the Trustee to file a motion for leave to amend in this case is not appropriate.

## V.    CONCLUSION

For the reasons set forth herein, the Court affirms the dismissal of Counts I, II, and III of the Complaint with prejudice.